## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DION HORTON, DAMON JONES,
CRAIG BROWNLEE, RAHDNEE
ODEN-PRITCHETT, TATE STANFORD,
AND ELIJAH BRONAUGH,
individually and on behalf of a class
of similarly situated persons;

|  |  |
|---|---|
| Plaintiffs, | |
| v. | Case No. ___2:22-CV-1391___ |
| JILL RANGOS, ADMINISTRATIVE JUDGE, in her official capacity; | |

FRANK SCHERER, DIRECTOR OF
ADULT PROBATION AND PAROLE, in
his official capacity;

ANTHONY MARIANI AND KELLY
BIGLEY, COURT OF COMMON PLEAS
JUDGES, in their official and individual
capacities;

CHARLENE CHRISTMAS, ROBERT
O'BRIEN, STEPHEN ESSWEIN, AND
RENAWN HARRIS, PROBATION
HEARING OFFICERS, in their official and
individual capacities;

And ORLANDO HARPER, in his official
capacity.

Defendants.

## COMPLAINT—CLASS ACTION
## JURY TRIAL DEMANDED

## STATEMENT OF THE CASE

1.     This case is about hundreds of individuals, like Plaintiff Dion Horton, who are jailed for months on end without a lawful justification and with virtually no way out.

2.     Nearly eight months ago, Mr. Horton was jailed after being accused of certain offenses. A judicial officer ordered he could be released on an unsecured monetary bond, meaning he could get out without an upfront payment. But because he happened to be on probation at the time of his arrest, a probation detainer—or an order prohibiting his release from jail—issued against him.

3.     At a pro forma proceeding shortly after his arrest, a bureaucrat from the probation department ordered Mr. Horton to stay in jail with no explanation and with no option to bond out.

4.     Mr. Horton has not been found guilty of any wrongdoing.

5.     Mr. Horton's unjustified incarceration has taken a toll on him. He lost his job (and the ability to provide for his family). He missed the birth of his child.

6.     Mr. Horton has virtually no recourse. By virtue of the probation detainer, he is trapped in jail. He has no idea when he will regain his liberty.

7.     Mr. Horton's case is not an aberration. Probation detainers are the single largest driver of incarceration at the Allegheny County Jail (ACJ). For people arrested for violating probation in Allegheny County, detention prior to a hearing on the merits of the alleged violation is the rule rather than the exception.

8.     On any given day over the last two years, roughly one third of the people caged at the ACJ (or upwards of 600 people daily) have had a probation detainer lodged against them.

9.     Once arrested for violating probation, individuals do not have a meaningful opportunity to obtain release. The majority are forced to remain in jail until a final determination on the merits of the alleged violation—a period that lasts months or even years.

1

10.   The decision to jail them for this duration is made at a perfunctory proceeding (referred to as a "*Gagnon* I" proceeding) that occurs up to 14 days after their arrest.[1]

11.   Bureaucrats in the probation department—who are neither judges nor lawyers—serve as hearing officers and preside over these proceedings ("Hearing Officers").

12.   Hearing Officers are supposed to determine probable cause and whether arrested individuals should remain detained until the final hearing on the merits of their alleged violation of probation (the "*Gagnon* II" hearing).

13.   *Gagnon* I proceedings are cursory in nature. Despite the appearance of a hearing, they are devoid of basic, constitutionally required procedural and substantive safeguards.

14.   Individuals do not have an opportunity to consult with their assigned public defender before the proceeding. They have no opportunity to prepare a defense. A probation officer reads the untested allegations against the individual. A Hearing Officer makes a determination with little to no additional information; no witnesses or evidence are ever presented.

15.   Hearing Officers do not consider, let alone find, whether the individual's incarceration is necessary to protect the community or ensure their appearance in court, as due process requires for prolonged incarceration.

16.   Hearing Officers do not have ultimate authority over the decisions they make during the *Gagnon* I proceedings. Instead, they issue recommendations to a judicial officer who has no first-hand knowledge of what transpired. That officer then determines ex parte whether to leave the detainer intact.

---

[1] *Gagnon v. Scarpelli*, 411 U.S. 778 (1973).

17.     As a matter of course, these judicial officers rubber stamp detention decisions but scrutinize recommendations to lift the detainer or transfer it to alternative housing (which would allow the individual to be detained at an alternative housing facility rather than at the ACJ).

18.     Hearing Officers make their recommendations based on a policy (approved by Administrative Judge Jill Rangos and Director of Probation Frank Scherer on behalf of Allegheny County) that requires *mandatory* detention in some cases. In other words, no matter the particular facts of the alleged probation violation and no matter any mitigating circumstances presented at the *Gagnon* I proceeding, the Hearing Officer must recommend detention.

19.     The policy requires mandatory detention if an individual is alleged to have violated a "zero tolerance" condition of probation or "has a new charge that represents a serious threat to public safety."

20.     Hearing Officers rely on the "new charge" provision to circumvent any decision-making regarding the necessity of detention. For specific offenses, based on the type of charge alone, they require mandatory detention—frequently refusing to hear any facts regarding what is alleged to have transpired.

21.     In a similar vein, they refuse to lift detainers where a zero-tolerance violation is alleged, typically where the individual is accused of using of drugs or alcohol. Even drinking a single can of light beer has been enough to trigger this provision in the past.

22.     Based on instructions they receive from their bosses (the judges), Hearing Officers treat the detainer policy as a floor for mandatory detention decisions, systematically expanding its reach. Specifically, Hearing Officers apply "no lift" policies required by Court of Common Pleas Judges Anthony Mariani and Kelly Bigley ("Judicial Defendants"), categorically refusing to recommend a detainer lift for anyone supervised by these judges.

3

23.     In these cases, Hearing Officers typically also refuse to recommend transferring the detainer to alternative housing.

24.     Judge Rangos and Director Scherer sanction this systematic expansion of the written detainer policy through their inaction. Despite the policymaking authority that enabled them to issue the detainer policy, they contend that they are not empowered to prohibit Judicial Defendants' no-lift policies.

25.     Because of the probation detainers, individuals are jailed until their violation of probation proceedings conclude. It does not matter whether a judicial officer has authorized their release on a new charge that forms the basis for the violation of probation. They are stuck.

26.     In practice, it is nearly impossible to get the detainer lifted once a hearing officer recommends detention at the *Gagnon* I proceeding.

27.     From the conclusion of the *Gagnon* I until shortly before the *Gagnon* II, a period that can last months or even years, individuals are not assigned a public defender on their probation case. So, they have no practical way to challenge their probation detainers, aside from hiring a private attorney to file a motion to lift a detainer on their behalf—which most cannot afford.

28.     For those who can afford to hire an attorney, filing a motion to lift the detainer does not allow them to avoid languishing in jail. Judges routinely delay ruling on these motions, and often deny them without a hearing or even an explanation.

29.     As a result, over the last two years, an average of 622 individuals per month (or 35% of the people caged at the Allegheny County Jail) have had a probation detainer lodged against them.[2] As of September 23, 2022, 651 individuals were lodged on a detainer.[3]

30.     Each is trapped in the jail for months on end before her *Gagnon* II proceeding.

31.     Such incarceration would only pass constitutional muster if a judicial officer found that detention pending the *Gagnon* II was necessary to prevent flight risk or ensure public safety. Hearing Officers make no such findings.

32.     As has been widely reported, the Allegheny County Jail has been a site of rampant human rights abuses.

33.     In recent years, the Allegheny County Jail has been the subject of litigation regarding excessive force, mistreatment of individuals with psychiatric disabilities, poor conditions, and inadequate medical treatment.

34.     The jail has also repeatedly been in the press for its overuse of solitary confinement, chronic understaffing, and unsanitary conditions.

35.     At least 17 people have died while in custody of the Allegheny County Jail since April 2020.[4]

---

[2] This data comes from the Allegheny County Jail Population Management Dashboard, which includes historical data regarding numbers of people incarcerated at the jail and the type of hold they were subjected to. *See Current and Historical Holding Statuses*, ALLEGHENY COUNTY JAIL POPULATION MANAGEMENT DASHBOARDS, https://bit.ly/3SnUQMK (last visited Sept. 21, 2022). Plaintiffs retrieved jail population data from the last two years and computed the average.

[3] *See Current Population Hold Types*, ALLEGHENY COUNTY JAIL POPULATION MANAGEMENT DASHBOARDS, https://bit.ly/3BCmzTc (last visited Sept. 23, 2022).

[4] Brittany Hailer, *Hours before he died, the Allegheny County Jail released an incarcerated man with intellectual disability from custody*, PITTSBURGH INSTITUTE FOR NONPROFIT JOURNALISM (Sept. 23, 2022), https://bit.ly/3fk3e1S ("Talotta is the 17th man to die after entering the jail since the onset of the pandemic, the sixth such death in 2022.").

36.     At least five of them had a probation detainer lodged against them when they died.[5]

37.     On behalf of themselves, and all others similarly situated, Plaintiffs seek a declaration that Defendants' policies and practices violate their rights under the United States and Pennsylvania Constitutions, an injunction against the continuation of these unconstitutional practices, and monetary compensation for the harm they have suffered.

## JURISDICTION AND VENUE

38.     Plaintiffs bring this civil rights action under 42 U.S.C. § 1983, 28 U.S.C. § 2201, *et seq.*, and the Fourteenth Amendment to the United States Constitution. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1367 (supplemental jurisdiction), and 28 U.S.C. § 2201 (Declaratory Judgment Act).

39.     Venue is proper in this judicial district and division pursuant to 28 U.S.C. § 1391. A substantial part of the events giving rise to the claims take place at the Fifth Judicial District Courts and the Allegheny County Jail in Pittsburgh, Pennsylvania.

---

According to local reporting, the jail does not "count" deaths of incarcerated individuals who are transferred from the jail to a hospital on medical release and die at the hospital. Brittany Hailer, *Thirteen men died after going to the Allegheny County Jail. Here are their stories.*, PITTSBURGH INSTITUTE FOR NONPROFIT JOURNALISM (March 13, 2022), https://bit.ly/3BYef1r. As such, 17 may be an undercount, and Allegheny County's official report of in-custody deaths is likely even lower. *See id.* This approach is of dubious validity under federal law. *See* Bureau of Justice Assistance, *Death In Custody Reporting Act: Reporting Guidance and Frequently Asked Questions*, U.S. DEPARTMENT OF JUSTICE (March 2022) at 5, https://bit.ly/3S6Si68.

[5] Based on publicly available court records, this includes Robert Blake (May 24, 2020); Cody Still (Oct. 1, 2020); Paul Allen (Oct. 9, 2021); Gerald Thomas (March 6, 2022); and Ronald James Andrus (Aug. 14, 2022).

## PARTIES

### I.   Plaintiffs

<u>Pre-*Gagnon* I Plaintiffs</u>

40.     Tate Stanford is a 22-year-old Black man. In March of this year, Judge Anthony Mariani sentenced him to a total of three years of probation. On or around September 27, 2022, he was arrested for allegedly committing new offenses. A magistrate judge set a $2,000 bond on those charges. But a probation detainer was issued against him, precluding his release from jail. Five days after his arrest, Mr. Stanford still does not know when he will have his *Gagnon* I proceeding.

41.     Elijah Bronaugh is a 23-year-old Black man who was arrested on or around September 27, 2022, for allegedly committing offenses that include burglary and carrying a firearm without a license. A magistrate judge set monetary bond at a total of $7,500, an amount Mr. Bronaugh could manage to pay. But he was on probation at the time of his arrest, and he was lodged on a detainer. Mr. Bronaugh has been jailed for about five days and, as far as he is aware, his *Gagnon* I proceeding has not yet been scheduled.

<u>Post-*Gagnon* I Plaintiffs</u>

42.     Dion Horton is a 22-year-old Black man who has been in jail since February 2022. He was arrested on two new cases while on probation (including charges of firearm possession and aggravated assault). A magistrate judge ordered his release on $5,000 unsecured bond in each case, but he could not get out of jail because of a probation detainer.

43.     At Mr. Horton's *Gagnon* I proceeding, which lasted only a few minutes, the Hearing Officer read the charges and refused to lift the detainer because of the nature of those charges. The Hearing Officer gave no other reason for why he needed to be jailed, stating only that Mr. Horton would have to stay in jail until his new case resolved. Eight months later, Mr. Horton remains in jail, with both his new case and *Gagnon* II still pending.

44.     Damon Jones is a 23-year-old Black man who has been in jail since February 2022. He was arrested on two new firearms-related charges while on probation. A magistrate judge set a $25,000 secured financial condition of release, and Mr. Jones managed to pay a non-refundable fee to a bail agent to get out of jail. Two days later, he was arrested for allegedly violating his probation.

45.     At Mr. Jones's *Gagnon* I proceeding, the Hearing Officer explained that the alleged probation violation was based on Mr. Jones's new charges. No one testified about the charges and the Hearing Officer did not consider the facts of the case, or the fact that Mr. Jones had been released from jail on those charges. The Hearing Officer refused to lift the detainer based on the nature of the new charges alone. The probation detainer is the only reason Mr. Jones is still in jail, nearly eight months after his arrest.

46.     Craig Brownlee is a 51-year-old Black man who was arrested on a violation of probation warrant after being released from jail on a $10,000 unsecured bond on the charges that formed the basis of the alleged violation. A probation detainer was issued against him. At his *Gagnon* I proceeding, the Hearing Officer refused to lift the detainer because Mr. Brownlee is supervised by Judge Mariani.

47.     Rahdnee Oden-Pritchett is a 23-year-old Black man. He was arrested in September of this year, and a magistrate judge set a $10,000 bond. At the time of his arrest, he was on probation supervised by Judge Kelly Bigley. Despite being determined eligible for release on the new charges, a probation detainer was imposed.

48.     At Mr. Oden-Pritchett's cursory *Gagnon* I proceeding, the Hearing Officer refused to lift the detainer, explaining that he would need to take it up with Judge Bigley at his *Gagnon* II hearing—and that he would not get the opportunity to do so until his new charges resolved.

## II.    Defendants

<u>County Defendants</u>

49.    Judge Jill Rangos is a Court of Common Pleas Judge in Allegheny County. She serves as the Administrative Judge of the Criminal Division.

50.    Frank Scherer is the Director of Allegheny County Adult Probation and Parole ("Adult Probation").

51.    In these capacities, Judge Rangos and Director Scherer approved a detainer policy for Adult Probation, requiring mandatory detention without regard to the individual circumstances of the alleged violation of probation. County Defendants are sued in their official capacities for declaratory, injunctive, and monetary relief.

52.    Orlando Harper is the Warden of the Allegheny County Jail. In this capacity, he has custody of all individuals detained at the jail, including those subject to probation detainers. Decisions to lodge and maintain probation detainers are thus ultimately executed by Warden Harper. He is sued in his official capacity for declaratory, injunctive, and monetary relief.

<u>Judicial Defendants</u>

53.    Judge Anthony Mariani and Judge Kelly Bigley are Court of Common Pleas Judges in Allegheny County. They are assigned to the Criminal Division. In this capacity, they sentence people to probation and oversee their probationary terms.

54.    Judges Mariani and Bigley have a blanket, administrative "no-lift" policy, meaning anyone they supervise who is arrested for allegedly violating their probation may not have their detainer lifted at their *Gagnon* I proceeding. Judicial Defendants are sued in their individual and official capacities for declaratory relief.

<u>Hearing Officer Defendants</u>

55.     Charlene Christmas, Robert O'Brien, Stephen Esswein, and Renawn Harris are managing probation officers at Adult Probation, a subdivision of the Court of Common Pleas. They report to the Court of Common Pleas criminal division judges, including Judicial Defendants. In this capacity, they serve as Hearing Officers overseeing *Gagnon* I proceedings and make decisions or recommendations regarding whether to lift a detainer. Hearing Officers are sued in their individual and official capacities for declaratory relief.

## OVERVIEW OF APPLICABLE LAW

56.     Revocation of probation is a loss of liberty. People facing revocation are entitled to procedural and substantive due process protections. *See Gagnon*, 411 U.S. 778; *Morrissey v. Brewer*, 408 U.S. 471 (1972); *Commonwealth v. Turner*, 80 A.3d 754, 764 (Pa. 2013), *cert. denied,* __ U.S. __, 134 S. Ct. 1771 (2014).

57.     The Court must provide people charged with violating their supervision with a "prompt" hearing, referred to in Pennsylvania as a "*Gagnon* I" proceeding, to determine whether there is probable cause to believe that they committed the violation alleged and whether they should be detained during the pendency of their violation proceedings.

58.     At the *Gagnon* I proceeding, the court must provide individuals notice of the alleged violation(s) of probation, an opportunity to appear and present evidence on their own behalf, a conditional right to confront adverse witnesses, an independent decision-maker, and a written report of the hearing. *See Gagnon*, 411 U.S. at 786 (citing *Morrissey*, 408 U.S. at 489).

59.     After the *Gagnon* I proceeding, the court must then conduct a hearing within a "reasonable time" to determine whether the person under supervision violated the conditions of release, and, if so, whether that person should be committed to prison or if other steps should be taken to protect society and improve chances of rehabilitation. *See id.* at 784-85; *Morrissey*, 408

U.S. at 479-80, 488. This final revocation hearing is referred to in Pennsylvania as a "*Gagnon* II" hearing.

60.     Prolonged incarceration pending the *Gagnon* II hearing is justified only if the government proves, and a neutral arbiter finds, that detention is necessary to prevent flight or ensure public safety. *See Zadvydas v. Davis*, 533 U.S. 678, 690-92 (2001); *Kansas v. Hendricks*, 521 U.S. 346, 358-69 (1997); *Foucha v. Louisiana*, 504 U.S. 71, 80-81 (1992); *United States v. Salerno*, 481 U.S. 749, 751 (1987). Given the absence of such procedural and substantive safeguards, Defendants' systemic detention practices are unconstitutionally punitive.

## STATEMENT OF FACTS

**I.     Defendants' Employ a Detainer Policy That Requires Mandatory Detention.**

61.     County Defendants Judge Rangos and Director Scherer have approved a formal, written Detainer Policy for Allegheny County Adult Probation ("Detainer Policy") that governs detention decisions when someone is accused of violating their probation.

62.     The Detainer Policy provides the "criteria" that probation officers should apply to determine whether an individual who is arrested "will be lodged in the jail on a detainer."

63.     It includes a "mandatory detention provision," requiring that the individual "shall be detained if he or she has a zero tolerance or mandatory detention court condition that has been violated, or the offender has a new charge that represents a serious threat to public safety."

64.     "Zero tolerance or mandatory detention court condition" typically refers to any use of alcohol or drugs.

65.     When an individual is accused of violating the terms of their probation, a probation officer applies this Detainer Policy to make a preliminary decision regarding whether the individual should be caged. If so, the probation officer lodges a "detainer" against them.

66.     Individuals jailed on probation detainers wait as long as 14 days after arrest to have their *Gagnon* I proceeding, an excessively long delay.

67.     At the *Gagnon* I proceeding, Hearing Officer Defendants are charged with determining whether there is probable cause for the probation violation and whether the individual should remain detained until their *Gagnon* II proceeding.

## II.     Hearing Officers Systematically Conduct Perfunctory *Gagnon I* Proceedings.

68.     Hearing Officers routinely and systematically conduct the *Gagnon I* proceedings in a perfunctory manner.

69.     In a sample of 2,259 *Gagnon* I proceedings observed by volunteer court watchers between January 10, 2021, and September 16, 2022, 427 (19%) were under 2 minutes; 782 (25%) were between 2 and 5 minutes, and 805 (36%) were marked as somewhere over 5 minutes. Only one proceeding was noted as 10 minutes; two were 15 and 20 minutes, respectively (all >1%).

70.     The proceedings take place via video conference over Microsoft Teams, with all individuals participating remotely.

71.     At the outset of the proceeding, Hearing Officers inform the detained individuals that the Hearing Officer will be making a decision about their detainer and that there is a public defender present who can speak on their behalf.

72.     A probation officer proceeds to read a report regarding the alleged violation of probation. They present no witnesses to testify, even where the probation officer does not have first-hand knowledge.

73.     The assigned public defender may then advocate for the detainer to be lifted or transferred to alternative housing (another form of detention, albeit outside the ACJ).[6]

---

[6] On rare occasions, an individual's privately retained defense counsel appears.

74.     The public defender does so without having had the opportunity to meet with their client, investigate the alleged violation, or obtain information that could be used in their client's defense. This prevents the public defender from presenting any evidence or challenging the factual basis for the alleged violation.

75.     Hearing Officers render a decision on the detainer without making any finding that detention is necessary to prevent flight or to ensure public safety. Indeed, because Hearing Officers systematically fail to consider information relevant to these factors, they do not have a basis for such a finding.

76.     In the vast majority of cases, Hearing Officers decline to release the individual.

77.     Based on a sample of 1,269 *Gagnon* I proceedings observed by volunteer court watchers between January 10, 2021, and September 16, 2022, release was recommended in only 255 cases (20.1%).

78.     Hearing Officers were responsible for 1,252 of these cases. Broken down by individual hearing officer, Charlene Christmas recommended release in only 70 of 418 cases (16.75%); Robert O'Brien recommended release in only 45 of 294 cases (15.31%); Stephen Esswein recommended release in only 106 of 372 cases (28.49%); and Renawn Harris recommended release in only 27 of 141 cases (16.1%).

79.     Hearing Officers' release rates were significantly low in cases involving technical violations and direct violations (new criminal charges) alike. In a sample of 1,121 cases notated by court watchers during the same time period, release was recommended in only 11% of cases involving a direct violation (26 out of 227 cases), 30% involving a technical violation (108 out of 354 cases), and 17% involving both (91 out of 540 cases).

80.     Though Hearing Officers inform detained individuals that the purpose of the *Gagnon* I proceeding is to make a decision about the detention, they routinely couch their "decision" in terms of a recommendation to be reviewed by a judicial officer.

81.     When Hearing Officers recommend detention, the recommendation is routinely rubber stamped by the reviewing judicial officer ex parte.

82.     Conversely, when Hearing Officers recommend that the detainer be transferred or lifted, the judicial officer scrutinizes and frequently overrides the recommendation.

83.     When recommending detention, Hearing Officers systematically fail to make any finding that detention pending the *Gagnon* II is necessary to prevent flight risk or to ensure public safety.

### III.     Hearing Officers Systematically Order Mandatory Detention Pursuant to County Defendants' Detainer Policy and Judicial Defendants' No-Lift Policy.

84.     In certain categories of cases, Hearing Officers systematically order mandatory detention, without regard to any individualized circumstances and without a case-specific finding regarding the necessity of detention. This occurs where the two mandatory detention provisions of the Detainer Policy are implicated, or for all people supervised by Judge Mariani and Judge Bigley, based on a blanket "no-lift" administrative policy Judicial Defendants have issued.

<u>Mandatory Detention Pursuant to County Defendants' Detainer Policy</u>

85.     In cases where an individual is alleged to have violated a "zero tolerance" condition of probation, Hearing Officers automatically order detention based solely on the nature of the alleged violation in accordance with the Detainer Policy's mandatory detention provision. They do not consider any evidence about the circumstances surrounding the alleged violation, nor do they make a finding that detention is necessary to prevent flight or ensure public safety.

86.     Even drinking a single can of light beer has been enough to trigger this provision in the past.

87.     Hearing Officers have also ordered mandatory detention for individuals battling opioid use disorder, no matter the fact that the ACJ is not equipped to provide proper medical treatment.

88.     Similarly, applying the mandatory detention provision of the Detainer Policy regarding "a new charge that represents a serious threat to public safety," Hearing Officers systematically order mandatory detention based on the nature of the underlying offense alone.

89.     Hearing Officers apply this mandatory detention provision to alleged offenses like aggravated assault and possession of a weapon, without reference to the facts of the alleged crime or the necessity of detention pending the *Gagnon* II proceeding.

90.     Hearing Officers' indifference to the factual record holds true even where a judicial officer has already determined that there is no need to detain the individual pretrial until their new case resolves and set conditions for the individual's release on the new offense.

91.     Indeed, Hearing Officers routinely require detention without even considering the individual's eligibility for release on the new charges.

92.     For example, Plaintiff Jones was arrested on two new charges while on probation. He was not only deemed eligible for release on these charges—he *was* released. He posted a $25,000 bond and got out of jail. A few days later, he was rearrested on the basis that the new charges were a violation of probation.

93.     At his *Gagnon* I proceeding, the Hearing Officer refused to lift the detainer because of the nature of the new charges, not considering the fact that Mr. Jones was not even being detained on those offenses.

94.     Plaintiff Horton was also accused of violating probation after being arrested in two new cases. A magistrate judge ordered his release on a $5,000 unsecured bond in each case. At the *Gagnon* I, the hearing officer did not take the magistrate's release order into account and refused to lift his detainer based on the nature of the offenses.

95.     Unsecured bond entitles a person to release with no up-front payment of bail. But for the detainer, Mr. Horton would have been released from jail.

96.     Despite the fact that judicial officers determined that neither Mr. Jones nor Mr. Horton needed to be jailed pretrial, Hearing Officers forced them to stay in jail pending their *Gagnon* II proceedings.

<u>Mandatory Detention Pursuant to Judicial Defendants' No-Lift Policy</u>

97.     Hearing Officers also routinely and systematically expand on the two mandatory detention provisions codified in the Detainer Policy by automatically recommending mandatory detention for anyone supervised by Judge Mariani or Judge Bigley. This is because Judicial Defendants have a categorical "no-lift" policy, meaning that every individual they supervise arrested for a probation violation will be jailed regardless of the specific circumstances of the alleged violation or the individual's risk of flight or harm to the community.

98.     In so doing, Hearing Officers frequently remark that Judicial Defendants have instructed them not to lift detainers for any individuals they supervise, or even recommend a transfer to alternative housing; that their hands are tied; and that they are powerless to provide any relief.

99.     Hearing Officers have made comments like: "It's Judge Mariani, I have no discretion in this case"; "I don't have the liberty to lift Mariani's detainers and that's that"; "There's nothing we can do here, even if all three of us [hearing officer, public defender, and

probation officer] want you out, Mariani won't let it happen"; "This is Judge Bigley. I'm not allowed to lift the detainer"; "This is Judge Bigley--I'm not allowed to release you."

100.     Frequently, the assigned public defender echoes the same sentiment, explaining to detained individuals that the detainer will not be lifted at the *Gagnon* I because of Judicial Defendants' preferences regarding detainers: "There is very little we can do because you have Judge Mariani and a zero tolerance condition"; "Judge Mariani does not give much leeway for hearing officers"; "The difficulty is the sentencing judge is Mariani and I'm not sure how much leeway the hearing officer has until the judge sees you"; "Judge Mariani wants everyone detained before he sees them for [*Gagnon*] IIs"; "The big problem is you have Judge Mariani on both of these cases, and he prefers to have people detained... We're dealing with a judge who doesn't want to let you out"; "Bigley makes her own decisions"; "Judge Bigley wants to see people personally who have new charges"; "Judge Bigley likes to make her own decisions"; "I'm limited in what I can do for you in part because Bigley likes to make her own decisions"; "[Judge Bigley] likes to see everyone who violates"; "Judge Mariani likes to make his own decisions."

101.     In other words, Judicial Defendants divest Hearing Officers of the ability to make an independent, individualized determination regarding the necessity of detention.

102.     Judicial Defendants do so through a blanket policy that anyone they supervise should remain detained. Hearing Officers defer to these instructions from their bosses, rendering the *Gagnon* I proceeding for the people they supervise utterly meaningless; the procedural protections it purports to afford ring hollow.

103.     This was the precise experience of Plaintiffs Brownlee and Oden-Pritchett. At their *Gagnon* I proceedings, Hearing Officers refused to lift the detainers because they were supervised by Judge Mariani and Judge Bigley, respectively.

17

104.     County Defendants sanction Judicial Defendants' expansion of the Detainer Policy.

105.     Despite the policymaking authority they have exercised by issuing the Detainer Policy (and despite Judge Rangos's general authority as the Administrative Judge), County Defendants do not prohibit Judicial Defendants from imposing a no-lift policy, or Hearing Officers from abiding by it.

## IV.     After the *Gagnon* I Proceeding, Detained Individuals Have No Meaningful Opportunity for Release.

106.     Once a Hearing Officer orders someone detained at the *Gagnon* I proceeding, they are effectively relegated to languish in jail until their *Gagnon* II proceeding, which is typically months later.

107.     As a matter of local custom, after the *Gagnon* I proceeding, only the supervising Common Pleas judge has the authority to lift the probation detainer.

108.     County Defendants could promulgate a policy allowing automatic review of detainer decisions after the *Gagnon* I proceeding.

109.     In fact, Allegheny County does this very thing for bail determinations, allowing a specific Court of Common Pleas judge to review pretrial incarceration decisions within a few days after a magistrate judge makes the initial determination.[7]

110.     Instead, no review of the detainer ever occurs unless an individual files a motion to lift the detainer.

111.     As a practical matter, most people on probation do not have access to an attorney to file such a motion—even if they are indigent and qualify for a public defender. While an individual may on paper be represented by the Public Defender's Office between their *Gagnon* I

_____

[7] Plaintiffs do not pass on the constitutional sufficiency of the initial bail setting proceedings or these bail review proceedings.

and *Gagnon* II proceedings, in reality there are often long gaps during which defendants lack access to representation.

112.    The Public Defender's Office employs horizontal representation, meaning that a different attorney represents an individual during different stages of their case.

113.    Between the conclusion of the *Gagnon* I hearing and shortly before the *Gagnon* II hearing, a period that can last months or even years, individuals are not assigned a public defender on their probation case.

114.    For example, when Plaintiff Horton met with a public defender months after his arrest, that attorney was there only to work with him on his new charges—not his alleged probation violation. A public defender has yet to meet with him about his probation case, nearly eight months into his incarceration.

115.    At the *Gagnon* I proceedings, Hearing Officers and the assigned public defender alike routinely tell individuals they should hire an attorney if they would like to move to lift the detainer.

116.    So, for the vast majority of people, who cannot afford to hire an attorney, even the prospect of filing such a motion is illusory.

117.    The few people who are able to hire an attorney for this purpose are still unable to avoid spending months in jail, as judges routinely delay ruling on these motions and they frequently deny them—often without a hearing or explanation.

118.    Plaintiff Jones, for example, hired an attorney to file a motion to lift his detainer. His supervising judge, Judge Rangos, denied it without a hearing.

## V.  Detainer Practices Are Widespread and Contribute Significantly to Pretrial Detention in the Allegheny County Jail.

119.  The reach of Defendants' unconstitutional and illegal policies and practices is significant.

120.  On any given day, about one third of the people caged at the Allegheny County Jail have a probation detainer lodged against them.

121.  As of September 23, 2022, 651 individuals—or 39.4% of the 1,651 total people in jail—had a probation detainer lodged against them.[8]

122.  The vast majority of these people would be eligible for release but for the detainer.

123.  264 individuals with a detainer (or 16% of the overall jail population) appear to be detained only because of a technical violation of probation.[9]

124.  280 individuals with a detainer (or 17% of the overall jail population) are awaiting trial on a new charge (i.e. the primary basis of the alleged probation violation is a new charge).[10]

---

[8] Allegheny County, *Current Population Hold Types*, ALLEGHENY COUNTY JAIL POPULATION MANAGEMENT DASHBOARDS, https://bit.ly/3BCmzTc (last visited Sept. 23, 2022), applying these filters:

| County Sentenced | Allegheny County Prob. Detainer | PA State Prob. Detainer | Awaiting Trial | External Detainer | Family Court | Release Condition |
|---|---|---|---|---|---|---|
| (All) | (All) | (All) | (All) | (All) | (All) | (All) |
| Yes | ● Yes | Yes | Yes | Yes | Yes | Yes |
| No | No | No | No | No | No | No |

[9] *Id.*, applying these filters:

| County Sentenced | Allegheny County Prob. Detainer | PA State Prob. Detainer | Awaiting Trial | External Detainer | Family Court | Release Condition |
|---|---|---|---|---|---|---|
| (All) | (All) | (All) | (All) | (All) | (All) | (All) |
| Yes | ● Yes | Yes | Yes | Yes | Yes | Yes |
| ● No | No | ● No | ● No | ● No | ● No | ● No |

[10] *Id.*, applying these filters:

| County Sentenced | Allegheny County Prob. Detainer | PA State Prob. Detainer | Awaiting Trial | External Detainer | Family Court | Release Condition |
|---|---|---|---|---|---|---|
| (All) | (All) | (All) | (All) | (All) | (All) | (All) |
| Yes | ● Yes | Yes | ● Yes | Yes | Yes | Yes |
| No | No | No | No | No | No | No |

125.    About 24 of those with a probation detainer had resolved their new cases and were in jail solely awaiting their *Gagnon* II proceeding.[11]

126.    Most of those with a new criminal case pending are eligible for release on the new case (i.e., as is the case with each of the Named Plaintiffs, a judicial officer has set monetary or non-monetary conditions for release). But because of the detainer, they are stuck in jail.

127.    Due to Defendants' unconstitutional and illegal policies and practices, people subject to probation detainers in Allegheny County are often detained for extended periods of time.

128.    The vast majority of people accused of violating probation because they allegedly committed a new criminal offense must wait three months (on average) between the resolution of their new case and the *Gagnon* II hearing—in addition to the months it takes for the new case to resolve.[12]

129.    There is no legal requirement for the *Gagnon* II to be delayed until after the new case resolves, let alone for months afterward—this is purely a matter of local practice, at the expense of individual liberty.

130.    Throughout this time, individuals suffer the incalculable harm of pretrial incarceration.

---

[11] *Id.*, applying these filters:

| County Sentenced | Allegheny County Prob. Detainer | PA State Prob. Detainer | Awaiting Trial | External Detainer | Family Court | Release Condition |
|---|---|---|---|---|---|---|
| ○ (All) | ○ (All) | ○ (All) | ○ (All) | ○ (All) | ○ (All) | ○ (All) |
| ● Yes | ● Yes | ○ Yes | ○ Yes | ○ Yes | ○ Yes | ○ Yes |
| ○ No | ○ No | ● No | ● No | ● No | ● No | ● No |

[12] *See, e.g.*, Allegheny County Safety + Justice Challenge, *Year Three Report (January 2021 – December 2021)* at 3, https://bit.ly/3DMYDPM (suggesting that it takes an average of 84 days between resolution of a new case and resolution of the probation violation).

131.    Pretrial incarceration harms people's lives beyond their loss of liberty. People who are jailed awaiting trial endure degrading and life-threatening conditions.

132.    For instance, people who are incarcerated pretrial can experience worsening mental illness, since conditions in jail can put a person under extreme stress and restrict access to needed medications;[13] a high likelihood of being assaulted, including sexual assault, especially in the first few days of incarceration; exposure to communicable diseases; inability to exercise; deprivation of sunlight and fresh air; and forcible separation from children and family.

133.    Other consequences of pretrial incarceration include loss of income, since people often lose their jobs while detained; loss of housing and missed payments on utilities and other bills, since people cannot make rent and other payments when jailed; and loss of physical or legal custody of children.

134.    Those few people who can actually afford an attorney to represent them in probation violation proceedings have a more difficult time communicating with their counsel, making it harder to prepare a defense. In the analogous pretrial incarceration context, detained individuals are more likely to be convicted, and sentenced to longer terms of incarceration, than comparable individuals who can prepare their defense out of custody.[14] And incarceration makes communities less safe, too: just two or three days of pretrial detention increases the risk of recidivism for low-risk persons.[15]

---

[13] *See Incarceration's Front Door: The Misuse of Jails in America*, VERA INSTITUTE OF JUSTICE (July 29, 2015), at 12, https://bit.ly/3rvEwyp.

[14] *See* Christopher T. Lowenkamp et al., Laura & John Arnold Found., *Investigating the Impact of Pretrial Detention on Sentencing Outcomes* 12, 14, 16, 18 (2013), https://bit.ly/3PjDgbO; Megan T. Stevenson, *Distortion of Justice: How the Inability to Pay Bail Affects Case Outcomes*, 34 J.L. ECON. & ORG. 511, 535–36 (2018).

[15] *See* Timothy R. Schnacke, Nat'l Inst. of Corr., *Fundamentals of Bail: A Resource Guide for Pretrial Practitioners and a Framework for American Pretrial Reform* 15-16 (2014),

135.    Conversely, reducing reliance on incarceration makes communities more safe. For example, under a consent decree approved by a federal court in November 2019, Harris County, Texas has been releasing most people arrested for misdemeanors promptly and following modified procedures at bail hearings to comply with the Constitution. Since the consent decree has been in place, the number of persons arrested for misdemeanors who had a new charge filed within a year has decreased, while the percentage of misdemeanor cases resulting in conviction has dropped by more than 50 percent.[16]

136.    The harmful effects of pretrial incarceration are particularly acute at the Allegheny County Jail.

137.    The inhumane conditions at the jail have been widely reported in the local media and are regularly discussed at monthly Jail Oversight Board (JOB) meetings. Recently, JOB members have heard concerns over "lockdown" practices at the jail, which potentially violate a local ban on the use of solitary confinement;[17] inadequate access to medications;[18] and unsanitary food that incarcerated individuals are forced to consume.[19]

---

https://bit.ly/3y6jNVk; Christopher T. Lowenkamp, Marie VanNostrand, & Alexander Holsinger, The Hidden Costs of Pretrial Detention (Laura & John Arnold Found. 2013).

[16] Brandon L. Garrett et al., *Monitoring Pretrial Reform in Harris County: Fourth Report of the Court-Appointed Monitor*, ODonnell v. Harris County, 16-cv-1414 (S.D. Tex.) at v-vi (Apr. 18, 2022), https://bit.ly/3PG3rt8; *see also* Fola Akinnibi, *Texas Bail Reform Reduced Jail Time and Crime, New Study Says*, BLOOMBERG (Aug. 30, 2022), https://bloom.bg/3C9bdYp.

[17] Julia Zenkevich, *Allegheny County Jail was on lockdown in June, some worry it may have violated the solitary confinement referendum*, 90.5 WESA (July 8, 2022), https://bit.ly/3UCTako.

[18] Juliette Rihl, *Mixed-up meds & long waits: How understaffing hurts medical treatment at Allegheny County Jail*, PUBLIC SOURCE (Jan. 7, 2021), https://bit.ly/3SwJO7V.

[19] Hannah Wyman, *Food at the forefront of Jail Oversight Board meeting*, PITTSBURGH POST-GAZETTE (May 6, 2022), https://bit.ly/3Uy5m61.

138.    There are several pending lawsuits against Allegheny County regarding the mistreatment of individuals caged at the jail, including litigation regarding excessive force, mistreatment of individuals with psychiatric disabilities, poor conditions, and inadequate medical treatment.

139.    Six people incarcerated at the Allegheny County Jail died this year alone. Seventeen individuals have died at the jail since the onset of the pandemic in 2020.[20] Based on publicly available court records, at least five of them were in jail solely because of a probation detainer.

140.    Named Plaintiffs themselves have paid significant personal costs of incarceration.

141.    Mr. Horton lost the job he had at Wal-Mart. He has two kids, a one-year-old son and a one-month-old daughter. Mr. Horton missed the birth of his daughter because he was in jail. He can no longer help support his girlfriend or either of his kids, putting a financial strain on their mothers. For instance, his son's mother lost her job because she could not afford a babysitter; had Mr. Horton not been in jail, he could have cared for his son while her mother was at work.

142.    Mr. Jones lost his housing and all of his belongings. His dog was taken to a dog pound. His siblings have been sending him money so he can buy commissary, which is in turn negatively impacting their ability to provide for their kids.

143.    Mr. Brownlee was infected with the COVID-19 virus twice while jailed at the ACJ. Being in jail has prevented him from seeing his four-year-old son or caring for his aging mother.

---

[20] Brittany Hailer, *Hours before he died, the Allegheny County Jail released an incarcerated man with intellectual disability from custody*, PITTSBURGH INSTITUTE FOR NONPROFIT JOURNALISM (Sept. 23, 2022), https://bit.ly/3fk3e1S.

## CLASS ACTION ALLEGATIONS

144.    Plaintiffs bring the claims in this action, on behalf of themselves and all other similarly situated, as a class action under Federal Rules of Civil Procedure 23(a)(1)-(4) and 23(b)(2)-(3).

145.    In accordance with these Rules, Plaintiffs seek to certify the following classes and subclasses:[21]

> **Pre-*Gagnon* I Class:** All individuals, who are now or will in the future be, detained at the Allegheny County Jail on an Allegheny County probation detainer awaiting a *Gagnon* I proceeding. This class is represented by Plaintiffs Stanford and Bronaugh, who seek certification under Rule 23(b)(2).

> **Pre-*Gagnon* I Mandatory Detention Subclass:** All individuals, who are now or will in the future be, detained in the Allegheny County Jail on an Allegheny County probation detainer pursuant to a mandatory detention policy and awaiting a *Gagnon* I proceeding. This class is represented by Plaintiffs Stanford and Bronaugh, who seek certification under Rule 23(b)(2).

> **Post-*Gagnon* I Class:** All individuals who, at any time since October 3, 2020 through the present, were ordered detained on an Allegheny County probation detainer at their *Gagnon* I proceeding without a finding that such detention was necessary to satisfy a legitimate government interest. This class is represented by Plaintiffs Horton, Jones, Brownlee, and Oden-Pritchett, who seek certification under Rule 23(b)(3).

> **Post-*Gagnon* I Mandatory Detention Subclass:** All individuals who, at any time since October 3, 2020 through the present, were ordered automatically detained on an Allegheny County probation detainer at their *Gagnon* I proceeding pursuant to a mandatory detention policy. This subclass is represented by Plaintiffs Horton, Jones, Brownlee, and Oden-Pritchett, who seek certification under Rule 23(b)(3).

146.    A class action is the only practicable means by which Plaintiffs and class members can challenge Defendants' unconstitutional policies, practices, and procedures. On any given day,

---

[21] For purposes of the subclasses, "mandatory detention" refers to circumstances in which individuals are automatically detained because they 1) are accused of violating a zero tolerance condition of probation; 2) are supervised by Judge Mariani or Judge Bigley; or 3) are accused of a new charge "that represents a serious threat to public safety."

upwards of 600 individuals incarcerated at the Allegheny County Jail have a probation detainer lodged against them.

147.    There are questions of law and fact common to all class and subclass members, including:

- What procedural protections and substantive standards Defendants apply at *Gagnon* I proceedings before ordering people jailed for the pendency of their violation of probation proceedings.

- Whether Defendants require mandatory detention for certain categories of individuals at their *Gagnon* I proceedings, regardless of the specific circumstances of their alleged violations of probation.

- Whether Defendants' custom, policy, or practice of perfunctory *Gagnon* I proceedings violates the procedural and substantive due process rights of people on probation.

- Whether Defendants' custom, policy, or practice of mandatory detention at *Gagnon* I proceedings violates the procedural and substantive due process rights of people on probation.

- Whether Plaintiffs are entitled to a finding that detention pending the *Gagnon* II proceeding is necessary to satisfy a legitimate government interest (i.e., ensuring public safety or preventing flight risk).

- How much money individuals should be compensated for each day of unconstitutional detention following a *Gagnon* I proceeding.

148.    Plaintiffs' claims are typical of the claims of the classes and subclasses. That typicality stems from the fact that Defendants have detained every class member in violation of the same constitutional rights, through the application of the same systemic customs, policies, or

practices. Put differently, Plaintiffs, like every other class member, are injured by the same unconstitutional customs, policies, and practices maintained by Defendants.

149.    The individual Named Plaintiffs will fairly and adequately represent the interests of the classes and subclasses. Named Plaintiffs do not have any known conflicts of interest with the unnamed members of the proposed classes.

150.    Named Plaintiffs are represented by attorneys from Civil Rights Corps and the Abolitionist Law Center who have experience in litigating complex civil rights matters, including class action lawsuits, in federal court and extensive knowledge of both the details of Defendants' practices and the relevant law. Counsel have the resources, expertise, and experience to prosecute this action.

151.    Defendants have acted and failed to act in a manner that applies generally to the classes and subclass as a whole, rendering class-wide relief appropriate.

152.    Because Plaintiffs challenge systemic customs, policies, or practices that apply to all class and subclass members, the questions of law and fact that are common to the Plaintiffs and the putative class predominate over individual questions, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

153.    The putative class is easily ascertainable, as it is defined in accordance with objective criteria that can be readily determined from records that Defendants keep.

## CLAIMS FOR RELIEF

### COUNT I:
### Right to Procedural Due Process Under the
### Fourteenth Amendment to the United States Constitution
*All Plaintiffs Against All Defendants*
*Declaratory Judgment, Injunctive Relief, and Monetary Damages*

154.    Plaintiffs re-allege and incorporate by reference the preceding allegations in this Complaint as if fully set forth herein.

155.    Plaintiffs have a right to an adequate hearing near the time of their arrest to determine whether there is probable cause to believe they violated the terms of their probation. *Gagnon*, 411 U.S. at 782.

156.    Defendants' unlawful custom, policy, or practice of conducting perfunctory *Gagnon* I proceedings up to 14 days after arrest and depriving Plaintiffs of an opportunity to present evidence, challenge the evidence against them, or have a determination made by an independent decision maker violates Plaintiffs' right to an adequate, timely hearing that provides basic procedural safeguards.

157.    Defendants' unlawful custom, policy, or practice of imposing mandatory detention following the *Gagnon* I proceedings in certain categories of cases, without regard to any individualized considerations, further violates Plaintiffs' rights.

158.    All Plaintiff classes and subclasses seeks a declaration that Defendants' policies and practices violate their rights under the Fourteenth Amendment.

159.    All Plaintiff classes and subclasses also seek injunctive relief against County Defendants enjoining the enforcement of their unlawful detainer custom, policy, or practice.

160.    The Post-*Gagnon* I class and subclass additionally seek compensation from County Defendants for every day of unconstitutional detention they suffered.

**COUNT II:**
**Right to Procedural and Substantive Due Process Under the**
**Fourteenth Amendment to the United States Constitution**
**(Prolonged Detention)**
*All Plaintiffs Against All Defendants*
*Declaratory Judgment, Injunctive Relief, and Monetary Damages*

161.    Plaintiffs re-allege and incorporate by reference the preceding allegations in this Complaint as if fully set forth herein.

162.    Defendants' unlawful custom, policy, or practice of detaining hundreds of individuals arrested for probation violations for prolonged periods pending final revocation proceedings without an adequate assessment to ensure such detention is necessary creates a risk of erroneous detention, in violation of individuals' procedural due process rights.

163.    Defendants' unlawful custom, policy, or practice of detaining people charged with supervision violations for prolonged periods without justification is punitive and does not bear a reasonable relationship to any legitimate purpose for detention, in violation of individuals' substantive due process rights.

164.    Defendants' unlawful custom, policy, or practice of prolonged incarceration following a mandatory detention decision at the *Gagnon* I proceeding in certain categories of cases, without regard to any individualized considerations, further violates individuals' rights.

165.    All Plaintiff classes and subclasses seek a declaration that Defendants' policies and practices violate their rights under the Fourteenth Amendment.

166.    All Plaintiff classes and subclasses also seek injunctive relief against County Defendants enjoining the enforcement of their unlawful detainer custom, policy, or practice.

167.    The post-*Gagnon* I class and subclass additionally seek compensation from County Defendants for every day of unconstitutional detention they suffered.

## COUNT III:
### Right to Procedural Due Process Under the Pennsylvania Constitution
*All Plaintiffs Against All Defendants*
*Declaratory Judgment, Injunctive Relief, and Monetary Damages*

168.    Plaintiffs re-allege and incorporate by reference the preceding allegations in this Complaint as if fully set forth herein.

169.    Pennsylvania Constitution art. 1, §§ 1, 9, and 11 protect an individual's rights to procedural due process, which are, at minimum, coextensive with federal due process requirements.[22] The due process protection includes the right to a prompt and adequate hearing at the time of arrest to determine whether there is probable cause to believe that the detainee has committed a violation of parole or probation.

170.    Defendants' unlawful custom, policy, or practice of conducting perfunctory *Gagnon* I proceedings up to 14 days after arrest and depriving Plaintiffs of an opportunity to present evidence, challenge the evidence against them, or have a determination made by an independent decision-maker violates Plaintiffs' right to an adequate, timely hearing that provides basic procedural safeguards.

171.    Defendants' unlawful custom, practice, or policy of ordering mandatory detention at the *Gagnon* I proceedings in certain categories of cases, without regard to any individualized considerations, further violates Plaintiffs' rights.

172.    All Plaintiff classes and subclasses seek a declaration that Defendants' policies and practices violate their rights under the Pennsylvania Constitution.

173.    All Plaintiff classes and subclasses also seek injunctive relief against County Defendants enjoining the enforcement of their unlawful detainer custom, policy, or practice.

---

[22] *Com. v. Aziz*, 724 A.2d 371, 377 (Pa. Super. 1999).

174.   The Post-*Gagnon* I class and subclass additionally seek compensation from County Defendants for every day of unconstitutional detention they suffered.

**COUNT IV:**
**Right to Procedural and Substantive Due Process**
**Under the Pennsylvania Constitution**
**(Prolonged Detention)**
*All Plaintiffs Against All Defendants*
*Declaratory Judgment, Injunctive Relief, and Monetary Damages*

175.   Plaintiffs re-allege and incorporate by reference the preceding allegations in this Complaint as if fully set forth herein.

176.   Pennsylvania Constitution art. 1 §§ 1, 9, and 11 protect an individual's right to due process of law.

177.   Defendants' unlawful custom, policy, or practice of detaining hundreds of individuals arrested for probation violations for prolonged periods pending final revocation proceedings without an adequate assessment to ensure such detention is necessary creates a risk of erroneous detention, in violation of individuals' procedural due process rights.

178.   Defendants' unlawful custom, policy, or practice of detaining people charged with supervision violations for prolonged periods without justification is punitive and is not narrowly tailored to any legitimate purpose for detention, nor does it bear any real and substantial relation to such a purpose, in violation of individuals' substantive due process rights.

179.   All Plaintiff classes and subclasses seek a declaration that Defendants' policies and practices violate their rights under the Pennsylvania Constitution.

180.   All Plaintiff classes and subclasses also seek injunctive relief against County Defendants enjoining the enforcement of their unlawful detainer custom, policy, or practice.

181.   The Post-*Gagnon* I class and subclass additionally seek compensation from County Defendants for every day of unconstitutional detention they suffered.

## REQUEST FOR RELIEF

182.    Plaintiffs request that this Court hold a jury trial, enter judgment in their favor, and

issue the following relief:

     a.  Class certification under Rule 23 of the Federal Rules of Civil Procedure;

     b.  A declaration that Defendants violate Plaintiffs' rights under the United States and Pennsylvania Constitutions by detaining those arrested for violating their probation for prolonged periods without meeting the substantive and procedural standards required for such detention;

     c.  Preliminary and permanent injunctions as to County Defendants and Judicial Defendants, requiring them to terminate their unconstitutional customs, policies, or practices, and to require constitutionally sufficient protections at the *Gagnon* I proceedings;

     d.  Compensatory damages against County Defendants as determined at a jury trial;

     e.  Reasonable attorneys' fees, expenses, and costs of litigation pursuant to 42 U.S.C. § 1988 and other applicable law; and

     f.  Such other relief as the Court deems just and proper.

Respectfully submitted this 2nd day of October, 2022.

/s/ Sumayya Saleh
Sumayya Saleh (D.C. 1743427)
sumayya@civilrightscorps.org
Katherine Hubbard (D.C. 1500503)*
katherine@civilrightscorps.org
Leo Laurenceau (FL 106987)*†
leo@civilrightscorps.org
CIVIL RIGHTS CORPS
1601 Connecticut Ave. NW, Suite 800
Washington, D.C. 20009
Phone: (202) 894-6132

/s/ Dolly Prabhu
Dolly Prabhu (PA 328999)
dprabhu@alcenter.org
Jaclyn Kurin (D.C. 1600719)*
jkurin@alcenter.org
Bret Grote (PA 317283)
bretgrote@abolitionistlawcenter.org
ABOLITIONIST LAW CENTER
PO Box 8654
Pittsburgh, PA 15221
Phone: (412) 654-9070

†Admitted to practice in Florida and New York. Not admitted in the District of Columbia; practice limited pursuant to App.R 49 (c)(8), with supervision by Katherine Hubbard.

*pro hac vice* application forthcoming