**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

DION HORTON, *et al.*,

|                                          |                          |
|------------------------------------------|--------------------------|
| Plaintiffs,                              |                          |
| v.                                       | Case No. 22-cv-1391      |
| JILL RANGOS, *et al.*,                   |                          |
| Defendants.                              |                          |

**PLAINTIFFS' SUPPLEMENTAL BRIEF
AFTER PRELIMINARY INJUNCTION HEARING
AND RESPONSE IN OPPOSITION TO DEFENDANTS'
<u>MOTIONS TO RECONSIDER THIS COURT'S MOTION TO DISMISS RULING</u>**

**TABLE OF CONTENTS**

INTRODUCTION                                                                                          1

DISCUSSION                                                                                            2

I.    The Evidence of Defendants' Unconstitutional Practices Is Unrebutted.                           2

     A.   Plaintiffs Proved the Existence of the Challenged Practices.                                2

     B.   Defendants Did Not Rebut Any of the Evidence Plaintiffs Presented.                          3

     C.   The Court Should Give Defendants' Rule 1006 Declaration No Weight.                          5

     D.   The Court Should Consider the Declaration of Plaintiffs' Expert.                            8

II.   Plaintiffs Seek a Prohibitory Injunction.                                                      10

III.  Due Process Requires a Suitability-for-Release Determination.                                  14

IV.   There is No Basis for this Court to Reconsider Its Motion to Dismiss Ruling.                   16

     A.   Procedurally, Defendants' Request Fails.                                                   16

     B.   Defendants' Request Fails Substantively, Too.                                              17

          1.   The Court Was Justified in Delaying on Ruling On the Immunity Defenses.              18

          2.   The Court Did Not Need to Address the Core Merits Question to Dispose of
               Defendants' Motions to Dismiss.                                                       19

CONCLUSION                                                                                           20

**INTRODUCTION**

The unrebutted evidence in support of Plaintiffs' motion for preliminary injunction proves that Defendants maintain an unconstitutional policy and practice of mandatorily jailing certain probationers without the required procedural protections or a substantive finding that their detention is necessary. Plaintiffs extensively briefed the legal issues and submitted myriad exhibits in the lead-up to the preliminary injunction hearing, at which they presented the testimony of five witnesses. As the Court acknowledged, Plaintiffs have developed a "comprehensive" factual record. Preliminary Injunction Hearing Transcript (Hrg. Tr.) at 184:17-19. Plaintiffs submit this brief only to address a few lingering factual and legal issues.

Plaintiffs first summarize the live witness testimony and demonstrate how Defendants failed to undermine any of the key facts at issue in this case. They next explain why the Court should give Defendants' unreliable Rule 1006 declaration no weight and consider the declaration of Plaintiffs' expert, Vincent Schiraldi, over Defendants' objections.

Turning to the legal issues, Plaintiffs explain why the injunction they seek is prohibitory, not mandatory. But no matter the standard, they prevail. To buttress their arguments that Defendants are required to hold a meaningful hearing on suitability for release at the *Gagnon* I stage, Plaintiffs explain that due process requires a hearing that is tailored to the nature of the deprivation and that a probable cause finding under the Fourth Amendment does not discharge this due process requirement.

Finally, at this Court's invitation, *see* Doc. 118, Plaintiffs respond to Defendants' baseless motions to reconsider the Court's motion to dismiss ruling. At bottom, Defendants are unhappy that they lost, so they are asking the Court to address issues they incorrectly believe would change the outcome. Disliking a ruling is not a basis for reconsideration, though.

**DISCUSSION**

## I.   The Evidence of Defendants' Unconstitutional Practices Is Unrebutted.

At the preliminary injunction hearing, Plaintiffs presented five witnesses who confirmed the existence of every key fact relevant to their claims. Plaintiffs' witnesses proved Defendants' systemic unconstitutional practices based on either personally enduring these practices or observing hundreds of *Gagnon* I proceedings, and this evidence is corroborated by Defendants' own data. Though they had the opportunity to do so, Defendants chose not to put on a single witness. So, the core facts establishing Defendants' constitutional violations are not in dispute. Instead of refuting these facts, Defendants resorted to ad hominem attacks and arguments that have nothing to do with the central question in this case—what due process protections are owed to individuals who are jailed pending their *Gagnon* II hearing. The Court should ignore these distractions, give no weight to Defendants' unreliable summary of the data, and find that the system operates exactly as Plaintiffs have described it since the inception of this lawsuit.

### A.   Plaintiffs Proved the Existence of the Challenged Practices.

The witnesses whose testimony Plaintiffs presented at the preliminary injunction hearing confirmed key aspects of the unconstitutional system Plaintiffs challenge:

- Probationers do not receive advance notice of their *Gagnon* I proceedings and have no opportunity to prepare. Hrg. Tr. at 11:12-12:7; 37:11-21; 87:24-88:11.

- *Gagnon* I proceedings are very brief—typically between five and ten minutes, and sometimes even less than that. Hrg. Tr. at 14:20-21 ("Q: How long did the whole proceeding last? MR. STANFORD: Like three to five minutes."); *id.* at 91:17-25 ("Q: Okay. How long would you estimate that that *Gagnon* I hearing lasted? MR. ODEN-PRITCHETT: Less than ten minutes. Like probably not even five minutes."); *id.* at 43:5-9 ("DR. REDCROSS: They would happen really fast."); *id.* at 60:18-21 ("MS. FENSTERMAKER: It would seem like the hearing officer would sort of shuffle the defendant through and cut them off if they were speaking for more than a few minutes.").

- Hearing Officers frequently silence probationers who attempt to advocate for themselves. Hrg. Tr. at 14:11-15; 60:12-21; 91:9-16.

2

- Hearing Officers do not inquire into factors related to flight risk of public safety, or even ask people subject to mandatory detention any questions. Hrg. Tr. at 13:14-14:10; 90:18-91:8; *see also id.* at 43:20-44:15.

- Hearing Officers routinely cite Judge Mariani and Judge Bigley as a reason they cannot recommend lifting a probationer's detainer. Hrg. Tr. at 12:23-13:13; 43:10-19; 61:17-23; 77:19-78:7; 90:3-14.

- For certain offenses, like charges involving firearms, "the detainer [is] never lifted." Hrg. Tr. at 62:2-12; 43:20-44:6. This is based solely on the type of charge; "it [is] not at all based on what actually happened in the incident." *Id.* at 62:2-12.

- Individuals spend months in jail between their arrest and *Gagnon* II hearing, including a lengthy delay between the resolution of any new charges and the *Gagnon* II hearing. Hrg. Tr. at 17:21-18:23; 93:15-95:10. But the data Defendants produced in discovery is not conducive to a comprehensive analysis of how long the delay usually lasts. *Id.* at 80:11-81:16.

This testimony is, of course, in addition to the countless declarations and other documentary exhibits Plaintiffs submitted with their preliminary injunction motion and supplemental brief, *see* Doc. 3-1; Doc. 82-1, which they have previously summarized, *see* Doc. 3 at 5-16; Doc. 82.

## B.    Defendants Did Not Rebut Any of the Evidence Plaintiffs Presented.

Defendants did not rebut any of this evidence. Critically, Defendants did not call a single witness to testify, which presumably they would have if they thought they could make a dent in the facts Plaintiffs presented. Rather, they resorted to mudslinging and arguments about irrelevant facts that have no bearing on their constitutional failings during *Gagnon* I proceedings.

Defendants' cross examination of Plaintiffs' witnesses did not undermine any of the key facts to which the witnesses testified. Notably, they did not even try to challenge the witnesses' descriptions of what transpires during the *Gagnon* I proceedings. Likewise, the gratuitous cross-examination of Plaintiffs Tate Stanford and Rahdnee Oden-Pritchett regarding the details of the offenses with which they were charged, *see* Hrg. Tr. at 22:21-27:21; 104:6-112:6,  is wholly

3

irrelevant to Plaintiffs' request for injunctive relief—the critical question in this case is whether Defendants provide the constitutionally required procedural and substantive safeguards as a prerequisite to Plaintiffs' incarceration (they do not), not whether the outcome would differ had there been a constitutionally compliant hearing.

Defendants' arguments about the quality of Plaintiffs' evidence at the close of the hearing were similarly unpersuasive. Astonishingly, Defendants argued that the no-lift policy "isn't borne out by the numbers. While their percentages are lower . . . [i]t's not like zero." *Id.* at 152:12-19. They also argued that "we have large percentages of detainers being recommended lifted anyway," *id.* at 170:5-9, even though the data actually shows that detainer lifts are recommended in only 3.7% of Judge Bigley's cases and 6% of Judge Mariani's. *See* Doc. 82-1, Ex. 5, Pls.' Rule 1006 Decl. ¶ 18. The existence of a small percentage of cases where Hearing Officers recommend a detainer lift (mostly involving technical violations) does not vitiate the existence of a systemic practice, under either *Monell* or common sense. *See* Doc. 91 at 19 (citing authority). Indeed, Judge Mariani's own lawyer conceded that "[t]here appears to be a 'don't automatically lift my detainer' preference." Hrg. Tr. at 170:5-9. And deposition testimony confirms that this "preference" has the force of law. Doc. 82-1, Ex. 1, O'Brien Dep. at 111:13-112:16; 117:8-18:3; 127:11-19; *id.* at Ex. 2, Scherer Dep. at 102:4-16; 156:15-157:20.

Perhaps recognizing that it is impossible for them to undermine evidence of the way in which *Gagnon* I proceedings occur in Allegheny County, Defendants attempted to shift the focus to steps they've allegedly taken to reduce the detainer population and to put the blame on public defenders. *See, e.g.*, Hrg. Tr. at 151:19-152:11 ("[T]here's an issue here of the Public Defender's Office."); *id.* at 157:14-24; 173:9-14. But it is not germane that Defendants do not jail all of the people accused of violating probation, as this case is about the subset of individuals who *are*

4

detained pending their *Gagnon* II hearings. And whether counsel effectively advocates for probationers during or after the proceeding is inconsequential here. The onus is on the government to provide constitutionally required protections, and this Court should reject Defendants' attempt to scapegoat defense counsel for their alleged failings, flipping the standard on its head. *See Steele v. Cicchi*, 855 F.3d 494, 507 (3d Cir. 2017) (explaining that a due process claim examines the procedures the government "made available" to the plaintiff); *Cain v. City of New Orleans*, 281 F.Supp.3d 624, 652 (E.D. La. 2017) (explaining that where the government is required to provide procedural protections, a contrary rule requiring the defendant to raise it on their own would undermine the due process protections).

### C.    The Court Should Give Defendants' Rule 1006 Declaration No Weight.

In advance of the preliminary injunction hearing, Defendants submitted a declaration under Federal Rule of Evidence 1006 authored by Sanjeev Baidyaroy, a manager and data analyst for Allegheny County Adult Probation. Primarily, he purports to summarize evidence regarding the median length of stay between *Gagnon* I and *Gagnon* II hearings (allegedly 68 days), as well as the percentage of detainers for undefined categories of new charges. Defendants did not produce Mr. Baidyaroy at the hearing, leaving Plaintiffs unable to cross-examine him or test his conclusions. But Plaintiffs demonstrated the lack of reliability of his Rule 1006 summary through the testimony of Lolo Serrano, Defendants' public report of extensive delays, and Plaintiffs' lived experiences. The Court should not give Mr. Baidyaroy's declaration any weight.

As an initial matter, Defendants' failure to call Mr. Baidyaroy deprived Plaintiffs of the "opportunity to exploit" the gaps in his analysis. *See United States v. Lynch*, 735 Fed. App'x 780, 786 (3d Cir. 2018) (citation omitted); *see also United States v. Bey*, No. 17-CR-208-1, 2019 WL 1236057, at *4 (E.D. Pa. Jan. 24, 2019) ("recognizing the importance of the issue" for which a

Rule 1006 declaration was submitted the court "conduct[ed] a lengthy hearing" into how the analysis was conducted). Even if the numbers Mr. Baidyaroy arrived at may technically be accurate, Plaintiffs believe they paint an incomplete picture. But Plaintiffs were unable to conclusively establish the inaccuracy of, or the context for, these numbers given Mr. Baidyaroy's notable absence at the hearing.

That said, given the tools at their disposal, Plaintiffs did demonstrate the unreliability of Mr. Baidyaroy's conclusion that the median duration of incarceration is 68 days. First, Lolo Serrano, a legal researcher with education in statistical methods and quantitative analysis (and who *did* make themselves available for cross examination at the hearing), did their best to approximate Mr. Baidyaroy's analysis. *See* Hrg. Tr. at 72:9-74:23. There were "three pertinent preconditions" to Lolo Serrano's ability to replicate the results, *id.* at 72:21-24, each of them fatal in its own right. First, they had to use a spreadsheet that did not take "into account whether the detainer was lifted at the *Gagnon* I or not." *Id.* at 72:25-73:7. This means that the 68-day figure included the roughly 20% of individuals whose detainer is recommended to be lifted at the *Gagnon* I proceeding, even though this case is only about the subset of individuals who remain detained. Second, they could not remove many duplicates from the spreadsheet, meaning that many entries were double counted. *Id.* at 73:8-25. Finally, they had to (incorrectly) assume that all individuals who were still subject to a detainer on November 16, 2022—the day the spreadsheet was created—had their detainer lifted on that date. *Id.* at 73:25-16. This means that that the length of stay for approximately 600 individuals was erroneously deflated. And in Lolo Serrano's own Rule 1006 declaration, they explained why "certain questions, such as the time between *Gagnon* I and *Gagnon* II hearings, could not be answered reliably" using the data produced in discovery. Pls.' Rule 1006 Decl. ¶ 10.[1]

---

[1] As discussed during the hearing, Plaintiffs will be submitting the spreadsheets underlying Plaintiffs' and Defendants' Rule 1006 declarations to the Court for ease of understanding the testimony about their contents.

The Court should disregard the unreliable 68-day median figure for an additional reason. A median obscures the length of time spent in jail for 49% of the population. The fact that many people spend much longer periods of time in jail is demonstrated by the Allegheny County Safety and Justice Challenge Report, which noted that an average of 84 days elapse between the resolution of an individual's new charges and their *Gagnon* II hearing (in addition to the many months it takes for the charges to resolve). *See* Doc. 85-2 at 10 (Ex. B at 3). That this reported average is significantly higher than the median suggests that the distribution of people who wait more than the median is much wider than the distribution of the people who wait less than the median. This means that a significant number of people spend *much* longer than 68 days in jail. This is borne out by Plaintiffs' testimony, which suggests that it is not uncommon for people to experience months-long delays between the two hearings. Plaintiff Oden-Pritchett testified that seven months elapsed between his arrest and *Gagnon* II hearing, including three months between resolution of new charges and the *Gagnon* II hearing. Hrg. Tr. at 93:15-95:10. And Plaintiff Stanford explained that his new charges resolved (by way of dismissal) seven months after his arrest and his *Gagnon* II hearing was not yet scheduled. *Id.* at 17:21-18:23.

To summarize, to the extent the duration of incarceration is relevant to the Court's analysis, it should not rely on the median length of stay, and it especially should not rely on the 68-day figure, which, as explained above, is artificially low. That said, how long people languish in jail until their *Gagnon* II hearing is not actually relevant to whether Defendants are violating Plaintiffs' substantive due process rights—that violation comes from Defendants' failure to institute the appropriate safeguards at the *Gagnon* I stage. The duration of incarceration is arguably only relevant to (but not dispositive of) the *Mathew*'s analysis to determine what procedural protections are required to safeguard the substantive right. *See* Hrg. Tr. at 132:4-133:6.

Mr. Baidyaroy also purports to summarize the percentage of detainers for new charges "by severest new charge type":

*% of Detainers for New Charges by Severest New Charge Type - 1/1/19 to 11/16/22*

|  | Person | Weapon | Property | Drug | DUI | Public Order | Other |
|---|---|---|---|---|---|---|---|
| % New Charges - All | 66% | 7% | 16% | 8% | 1% | 2% | <1% |
| % New Charges - Detainers Since 6/7/21 | 67% | 6% | 19% | 5% | 2% | 1% | <1% |

It is unclear what these numbers are supposed to signify. But to the extent Defendants are suggesting that detention is not always recommended for people accused of certain types of offenses at the *Gagnon* I proceeding, this "summary" is not helpful. Critically, Mr. Baidyaroy does not define what any of these categories mean. What constitutes a "person" offense? Or a "weapon" offense? *Cf.* Pls.' Rule 1006 Decl. ¶ 16 n.4 (explaining what violation result they included in each category of their summary). Without any explanation of what these figures summarize, they are not probative of any fact in dispute (nor do Plaintiffs have a way to test their reliability).

Given the apparently faulty or incomplete assumptions underlying Mr. Baidyaroy's analysis, the Court should give his summary no weight.

### D.     The Court Should Consider the Declaration of Plaintiffs' Expert.

The only piece of evidence whose admissibility is in dispute is the declaration of Plaintiffs' expert Vincent Schiraldi. Schiraldi Decl., Doc. 82-1, Ex. 7. This Court should consider Secretary Schiraldi's declaration, even though he could not testify at the hearing.

Plaintiffs did not have to produce Secretary Schiraldi because live witness testimony is not a prerequisite for admissibility at the preliminary injunction stage. *See Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 718 (3d Cir. 2004) (approving of "affidavits and other hearsay materials" being "received in preliminary injunction proceedings (citation omitted)). Courts routinely rely on expert reports in the absence of their live testimony. *See, e.g., Cigar Assn. of Am. v. City of*

*Philadelphia*, 500 F.Supp.3d 428, 436-37 (E.D. Pa. 2020) (relying on expert report to find irreparable injury at preliminary injunction stage); *Epsilon Energy USA, Inc. v. Chesapeake Appalachia, LLC*, 1:21-CV-00658, 2021 WL 1945699, at *6 (M.D. Pa. May 18, 2021) ("The court admitted Roach's expert report into evidence."); *Chimenti v. Kimber*, CIV. 3:CV-01-0273, 2009 WL 2957792, at *3 (M.D. Pa. Sept. 10, 2009) (appointing expert to evaluate plaintiff's medical condition and noting that the outcome of plaintiff's request for preliminary injunction would hinge on the doctor's report).

The crux of Defendants' opposition to Secretary Schiraldi's declaration is that they "could have put on a witness to kind of contradict some of the facts that he relied on in his declaration." Hrg. Tr. at 146:14-24 (relying on arguments raised in response to Plaintiffs' motion to have Secretary Schiraldi testify remotely); *see also* Doc. 103 at 2 ("Secretary Schiraldi is not a straightforward fact witness whose testimony would be relatively brief and not involve references to exhibits and other documents."); *see also* Doc. 100 (raising arguments specific to the Fed. R. Civ. P. 43 standard).

But it was not a foregone conclusion at the hearing that the Court would not consider Secretary Schiraldi's declaration. Defendants could have, but chose not to, attempt to impeach some of the factual bases for his expert opinion. For example, they could have cross examined Plaintiffs Tate Stanford and Rahdnee Oden-Pritchett about the information they provided for the expert declaration. *See* Schiraldi Decl. ¶ 13. Or they could have called any of a number of fact witnesses—ranging from probation officers to supervising judges—to testify about the ways detention decisions are made or how *Gagnon* I proceedings occur in Allegheny County to attempt to rebut Secretary Schiraldi's opinion that "Allegheny County's perfunctory hearings result in high rates of detention" or his understanding of how the Detainer Policy works. *Id.* ¶¶ 18-32, 50-57.

9

Defendants' strategic failings are not a basis to exclude evidence that Plaintiffs properly and timely submitted.

At minimum, this Court should consider Secretary Schiraldi as a fact witness. His declaration includes copious facts (with citations to authority) that support each of his seven opinions. *See* Schiraldi Decl. ¶¶ 34, 37-41, 43-44, 47, and 59-67; *see also* Doc. 82 at 10-13 (summarizing Secretary Schiraldi's expert conclusions). These facts help situate Allegheny County's practices in the context of what the research shows about the harm of and lack of necessity of pre-revocation incarceration. As reflected in the Court's own questions during the preliminary injunction hearing, this sort of information is helpful to the Court in assessing where Allegheny County's practices fall short and the feasibility of the proposed injunctive relief, among other things. *See* Hrg. Tr. at 130:25-131:2 ("THE COURT: Can I ask you, and it may be referenced in the Schiraldi declaration, as I recall. What is the optimal time between *Gagnon* I and *Gagnon* II hearings?"); *see also* Schiraldi Decl. ¶¶ 60-65 (describing jurisdictions that have limited the duration between the preliminary and final revocation hearings).

## II.    Plaintiffs Seek a Prohibitory Injunction.

The injunction Plaintiffs seek is a prohibitory one, requiring them only to show that their likelihood of success on the merits is "significantly better than negligible but not necessarily more likely than not." *Reilly v. City of Harrisburg*, 858 F. 3d 173, 179 (3d Cir. 2017).

The key distinction between a mandatory and prohibitory injunction is whether the plaintiffs seek to modify the status quo. *See C.G. by and through P.G. v. Saucon Valley Sch. Dist.*, 571 F. Supp. 3d 430, 438–39 (E.D. Pa. 2021). Specifically, a prohibitory injunction maintains the status quo, while a mandatory injunction alters the status quo and provides "relief [that] cannot be undone even if the defendant prevails at a trial on the merits." *Id.* (citation omitted). The status

quo is "the last peaceable, non-contested status between the parties." *See KOS Pharmaceuticals, Inc.*, 369 F. 3d at 708 (cleaned up). As described below, the "last non-contested status between the parties" in this case was before Plaintiffs endured the unconstitutional mandatory detention and *Gagnon* I proceedings that are the subject of this motion.

Classifying an injunction as "mandatory" or "prohibitory" requires a conceptual choice about which point is used as a baseline frame of reference to determine the "status quo." A number of circuit courts have therefore rejected a heightened burden for "mandatory" injunctions or at least questioned whether there is a viable distinction between the two. *See, e.g.*, *Chicago United Indus., Ltd. v. City of Chicago*, 445 F.3d 940, 944 (7th Cir. 2006) (Posner, J.) ("Whether and in what sense the grant of relief would change or preserve some previous state of affairs is neither here nor there. To worry these questions is merely to fuzz up the legal standard."); *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 1006 (10th Cir. 2004) (en banc) (Seymour, J., concurring in part and dissenting in part) (acknowledging that "determining whether an injunction is mandatory as opposed to prohibitory can be vexing," and that cases can involve "important competing status quos"); *United Food & Commercial Workers Union, Local 1099 v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 348 (6th Cir. 1998) (rejecting heightened burden for mandatory injunctions because it saw "little consequential importance to the concept of the status quo"); *Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 34 (2d Cir. 1995) (noting that "[t]he distinction between mandatory and prohibitory injunctions is not without ambiguities or critics," and that it has "led to distinctions that are 'more semantic than substantive'" (citation omitted)).

But because the Third Circuit requires courts to discern between a mandatory and prohibitory injunction by defining the status quo, the Court must do so here. In this case, the status

11

quo is the position Plaintiffs were in before Defendants subjected them to unconstitutional mandatory detention pending their *Gagnon* II hearing. While the Third Circuit has not weighed in on the question of mandatory or prohibitory injunction in a case like this, *Hernandez v. Sessions*, 872 F.3d 976 (9th Cir. 2017), is on all fours.

In *Hernandez*, individuals in immigration detention sought preliminary injunctive relief to put an end to unconstitutional bail hearings and, like here, the defendants argued that the injunction was mandatory. *Id.* at 982, 998. The Ninth Circuit noted that an injunction seeking to "prevent[] future constitutional violations" is a "classic form of prohibitory injunction." *Id.* at 998. So it determined that the injunction was prohibitory because "it prohibits the government from conducting new bond hearings under procedures that will likely result in unconstitutional detention." *Id.* Exactly the same is true with respect to Plaintiffs' pre-*Gagnon* I mandatory detention subclass: Plaintiffs seek to prohibit Defendants from conducting *Gagnon* I proceedings under procedures that will result in illegal incarceration.

*Hernandez* also considered the nature of an injunction like the ones Plaintiffs seek on behalf of the post-*Gagnon* I subclass—*i.e.*, one that would require Defendants to conduct new *Gagnon* I procedures *if* they wish to keep detaining those who were previously jailed after a constitutionally deficient proceeding. The court recognized that depending on how you looked at it, such an injunction could be viewed as either mandatory or prohibitory. *Id.* at 989-99. It then found that the plaintiffs had demonstrated the entitlement to a preliminary injunction under either test so it assumed without deciding that the injunction was mandatory in nature. *Id.* at 999.

But the Ninth Circuit's rationale for why such an injunction could be construed as prohibitory is persuasive here: It could "be understood as merely prohibiting the government from continuing to detain individuals subject to [detainers imposed] through unconstitutional

12

procedures." *Id.* Plaintiffs' proposed order demonstrates exactly that. Specifically, Plaintiffs simply seek an order enjoining County Defendants "from detaining at the Allegheny County Jail any putative mandatory detention subclass member who has been arrested for an alleged violation of probation and who has not received" delineated procedural and substantive safeguards. Amended Proposed Order at 2. In other words, it is prohibitory because it is an order "enjoining [such] and such from doing X, Y, and Z" rather than one "compelling [them] to take this type of action." Hrg. Tr. at 139:8-10.

And the relief Plaintiffs seek on behalf of both subclasses could theoretically be undone after a trial at the merits, which is another hallmark of a prohibitory injunction. *See C.G*, 571 F. Supp. 3d at 438–39. This is because the proposed injunction would simply require the enforcement actor (Warden Harper) to abstain from doing something (unconstitutional detention) rather than compel Defendants to take some affirmative action. So if Plaintiffs were to lose, Defendants could return to their pre-preliminary injunction practices of detaining individuals without reference to whether specific procedural or substantive safeguards were met. *Cf. Pub. Int. Legal Found. v. Boockvar*, 495 F. Supp. 3d 354, 358 (M.D. Pa. 2020) (finding injunction mandatory because it would require defendants to take the "positive act" of removing people from the voter rolls, and their resulting inability to vote in the 2020 election could not be retroactively remedied).

But like the plaintiffs in *Hernandez*, no matter what standard the Court applies, Plaintiffs have demonstrated an entitlement to relief. As previously explained, *see* Doc. 90 at 7-14; Doc. 91 at 9-13, they have shown "a substantial likelihood of success on the merits and that their right to relief is indisputably clear." *C.G.*, 571 F. Supp. 3d at 439. This is because "a long line of Supreme Court precedent establishes the substantive protection Plaintiffs seek," Doc. 90 at 15, and "Defendants systematically fail to honor *Gagnon*'s textual requirements," Doc. 91 at 7.

13

### III.    Due Process Requires a Suitability-for-Release Determination.

Plaintiffs have extensively briefed the merits of their hybrid substantive and procedural due process claim. Doc. 3 at 19-28; Doc. 90 at 7-12, 15-16; Doc. 91 at 9-15. They address now two more reasons due process requires a suitability-for-release determination, and why the probable cause finding Defendants make (if in name only) does not suffice.

The Supreme Court has repeatedly held that a hearing is only adequate if it tests the state's application of its rationale for the deprivation at issue in the individual's case. For example, in *Bell v. Burson*, the Court held that where a statutory scheme made "[driver] liability an important factor in the State's determination to deprive [an uninsured driver involved in a car accident] of his licenses," the State could "not, consistently with due process, eliminate consideration of that factor in its [pre-suspension] hearing." 402 U.S. 535, 535–36, 541–43 (1971). In *Stanley v. Illinois*, 405 U.S. 645, 653 (1972), the Supreme Court called the statutory scheme in *Bell* "repugnant to the Due Process Clause" because it enacted a deprivation "without reference to the very factor . . . that the State itself deemed fundamental to its statutory scheme." And in *Schall v. Martin*, 467 U.S. 253, 255–57, 275–77 (1984), the Court found that procedures for detaining juveniles on public safety grounds pending trial were sufficient to prevent a high risk of error because the juveniles were provided both a probable cause hearing *and* a detention hearing where they could contest the government's public safety arguments).

As they are currently constituted, *Gagnon* I proceedings simply do not meaningfully give individuals an opportunity to be heard on factors relevant to suitability for release pending the *Gagnon* II hearing. *See, e.g.*, Hrg. Tr. at 13:16-14:10; 90:18-91:8; *see also id.* at 43:20-44:15. Hearing Officers instead cower behind mandatory detention policies and practices, insisting that their hands are tied and that they do not have discretion to consider release.

14

The *Gagnon* I probable-cause determination is an insufficient basis to detain for a second reason as well. There are two prerequisites to detention: 1) probable cause, which satisfies the Fourth Amendment; and 2) necessity for detention (to ensure public safety or court appearance), which satisfies substantive due process. *Gerstein v. Pugh* and *United States v. Salerno* illustrate the distinction.

In *Gerstein*, the Supreme Court struck down a Florida law allowing "a person arrested without a warrant and charged by information" to "be jailed . . . pending trial without any opportunity for a probable cause determination." *Gerstein v. Pugh*, 420 U.S. 103, 116 (1975). In so doing, it found that the Fourth Amendment required a finding of "probable cause for detaining the arrested person pending further proceedings." *Id.* at 120. Twelve years later, in *Salerno*, the Supreme Court considered a substantive due process challenge to the Bail Reform Act. *United States v. Salerno*, 481 U.S. 739, 739 (1987). It found that the Act passed constitutional muster because it limits "detention prior to trial" to only those who, "after an adversary hearing," are found "to pose a threat to the safety of individuals or to the community which no condition of release can dispel." *Id.* at 755.

In short, the Fourth Amendment and substantive due process protect different rights, and a finding that satisfies one cannot be construed as satisfying the other. If probable cause were enough to safeguard an individual's substantive due process right to pretrial liberty, the Supreme Court would not have needed to decide *Salerno*—*Gerstein* would have been dispositive. So too here. The dicta from *Morrissey v. Brewer* that a probable cause finding "would be sufficient to warrant the parolee's continued detention," 408 U.S. 471, 486 (1972), must be read to refer to the Fourth Amendment probable cause determination. On the other hand, as in *Salerno*, the substantive due process right Plaintiffs seek to safeguard requires a finding of necessity after an adversary hearing.

15

This is just another reason that the *Morrissey* dicta upon which Defendants so heavily rely is not in conflict with Plaintiffs' arguments. *See* Doc. 90 at 7-9.

### IV.    There is No Basis for this Court to Reconsider Its Motion to Dismiss Ruling.

Plaintiffs briefly address Defendants' motions to reconsider this Court's motion to dismiss ruling, Docs. 111-115. Since all three motions make the same request, *see* Doc. 113 at 2 n.1; Doc. 115 at 4, Plaintiffs address them simultaneously. Defendants' request for reconsideration is procedurally and substantively infirm. Defendants just don't like this Court's ruling. But "mere dissatisfaction" is not a basis for reconsideration, *Deeters v. Phelan Hallinan & Schmieg, LLP*, 3:11-CV-252, 2013 WL 6524625, at *2 (W.D. Pa. Dec. 12, 2013).

### A.  Procedurally, Defendants' Request Fails.

As an initial matter, there is no procedural vehicle in the Western District of Pennsylvania to seek rehearing of the *denial* of a motion to dismiss. Rule 59(e), which Defendants invoke, "governs '[a] motion to alter or amend a judgment,' but the Court's denial of Defendants' motion to dismiss is not an entry of 'judgment' contemplated by Rule 59(e)." *Loughlin v. Harada*, 20-CV-1055-LPS, 2022 WL 610672, at *1, n.1 (D. Del. Feb. 28, 2022). Likewise, an order denying a motion to dismiss is not a "final judgment, order, or proceeding" as contemplated by Rule 60. *See* Fed. R. Civ. P. 60(b); *cf. Melvin v. Kenney*, 20-CV-03529-JMY, 2020 WL 10965924, at *1, n.1 (E.D. Pa. Dec. 16, 2020) (reconsidering order granting motion to dismiss under Rules 59(e) and 60(b) because it was a final judgment). And unlike other jurisdictions in this Circuit, the Western District does not have a generic local rule for motions to reconsider. *Compare* W.D. Pa. Local Rules *with* M.D. Pa. Local Rule 7.10; E.D. Pa. Local Rule 7.1(g); *and* D. N.J. Local Rule 7.1(i).

Put simply, it is not "beyond peradventure," Doc. 115 at 4, that there is a procedural hook for Defendants' request. The cases Defendant Mariani cites, Doc. 115 at 4-5, are inapposite

because they involve situations where the request for reconsideration *was* properly invoked under the federal or local rules. *See Gutierrez v. Ashcroft*, 289 F. Supp. 2d 555, 559 (D. N.J. 2003) (addressing Rule 59(e) motion after entry of final judgment in habeas proceedings); *Eisert v. Town of Hempstead*, 918 F. Supp. 601, 606 (E.D.N.Y. 1996) (finding that Rule 59(e) did not apply because no final judgment was entered but construing motion as request for reconsideration under a local rule allowing for "motions for reargument"); *see also Sanluis Developments, L.L.C. v. CCP Sanluis, L.L.C.*, 556 F. Supp. 2d 329, 331 (S.D.N.Y. 2008) (explaining bases for reconsideration under Rule 59(e)). While this Court *may* exercise its inherent powers to address the merits of Defendants' motion, *see Deeters, LLP*, 2013 WL 6524625, at *1, it does not have to do so.

### B.    Defendants' Request Fails Substantively, Too.

Even if the Court chooses to invoke its inherent power to reach the merits of Defendants' request, they have not remotely demonstrated their entitlement to the extraordinary relief they seek. "[C]ourts tend to grant motions for reconsideration sparingly and only upon the grounds traditionally available under Rule 59(e)." *Deeters, LLP*, 2013 WL 6524625, at *1 (cleaned up).

Defendants' argument is two-fold. First, they fault the Court for declining to address whether any of the various immunities they invoked apply. *See* Doc. 112 at 3-7; Doc. 113 at 2; Doc. 115 at 4. And second, they fault the Court for not addressing the merits of Plaintiffs' request for what they describe as a "bail-like" determination. Doc. 112 at 7-8; Doc. 115 at 5-7. ("Suitability for release" is a more apt descriptor because Plaintiffs do not seek a right to bail pending their final revocation hearing.)

But reconsideration is justified only on a showing of: (1) "an intervening change in controlling law;" (2) "the availability of new evidence not previously available;" or (3) "the need to correct a clear error of law or prevent manifest injustice." *Deeters*, 2013 WL 6524625, at *2

17

(citation omitted). Defendants have not explicitly raised any of these grounds. Instead, their arguments reflect that they are "unhappy litigant[s]" seeking "one additional chance to sway the judge." *Innis v. Wilson*, 07-CV-1343, 2008 WL 5047841, at *1 (W.D. Pa. Nov. 25, 2008) (cleaned up). Reconsideration is not warranted.

   1.   *The Court Was Justified in Delaying on Ruling On the Immunity Defenses.*

Construed generously, Defendants may be arguing that the Court's failure to rule on immunities constitutes a "clear error of law" because "immunity questions must be resolved 'at the earliest possible stage' of litigation." Doc. 112 at 2-3 (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991)). But *Hunter* does not say that a court must rule on what immunities apply at the motion to dismiss stage, as would ostensibly be required to show a clear error of law. (In fact, *Hunter* arose at summary judgment, *see id.*) Nor is such a requirement supported by the law.

Quite the contrary. Context-dependent, there may be good reason to delay ruling on immunities until a factual record has been developed. *See Mitchell v. Forsyth*, 472 U.S. 511, 527 (1985) (explaining how factual development of a case may affect a court's ruling on an immunity defense). In that vein, the Supreme Court tacitly approved of delaying an immunity ruling until summary judgment. *See id.* at 526-27 (holding that "the court's denial of summary judgment finally and conclusively determines the defendant's claim of right not to *stand trial* on the plaintiff's allegations" such that an interlocutory appeal is justified). The Third Circuit has likewise admonished that "it is generally unwise to venture into a qualified immunity analysis at the pleading stage as it is necessary to develop the factual record in the vast majority of cases." *Newland v. Reehorst*, 328 Fed. Appx. 788, 791 n.3 (3d Cir. 2009). This Court's conclusion that Defendants' immunity defenses are "better addressed as part of the preliminary-injunction motion, on a motion for summary judgment, or at trial," Doc. 104 at 9, is exactly in line with this precedent.

Putting aside Defendants' failure to meet the Rule 59 standard, their argument is not persuasive. For example, they make the bold claim that under "binding case law . . . damages are not available" against Judge Rangos and Director Scherer. Doc. 112 at 4. Not so. This is a question of fact that depends on the precise role these actors play in the conduct at issue in this litigation. *See* Doc. 67 at 11. And their related argument that allowing Plaintiffs' damages claim to proceed would be a "financial and resource drain" because they "would have to conduct discovery (including depositions) about damages for every Plaintiff – including those in the proposed class," Doc. 112 at 5 n.2, fundamentally misunderstands how a damages class action works. *See In re Suboxone (Buprenorphine Hydrochloride and Nalaxone) Antitrust Litig.*, 421 F. Supp. 3d 12, 63 (E.D. Pa. 2019) (explaining that under Fed. R. Civ. P. 23(b)(3), plaintiffs must simply show "that a reliable method is available to prove damages on a class-wide basis"). Defendants' remaining contentions invoke a similar combination of merits issues with arguments about how they do not want to be "subject to the cloud of litigation." Doc. 112 at 6. But a motion for reconsideration cannot be used "as a means to reargue matters already argued and disposed of or as an attempt to relitigate a point of disagreement between the Court and the litigant." *Ogden v. Keystone Residence,* 226 F.Supp.2d 588, 606 (M.D. Pa. 2002).

> 2.      *The Court Did Not Need to Address the Core Merits Question to Dispose of Defendants' Motions to Dismiss.*

Defendants' second request for reconsideration—that the Court should rule on the merits of Plaintiffs' claims—is also baseless. The mere fact that the question of what due process protections apply as a pre-requisite to pre-revocation detention is "vital in this case," Doc. 112 at 7, does not mean that the Court erred in choosing not to explicitly resolve it at the motion to dismiss stage. But it did not wholly ignore it either: the Court correctly found that "plaintiffs plausibly state claims that their due-process rights were violated," Doc. 104 at 8, which is all that Rule 12

19

requires, *see* Fed. R. Civ. P. 12(b)(6). The Court was well within the scope of its authority to put off defining the exact nature of those due process rights.

This argument also totally ignores the fact that a ruling on the key merits question in this case—where a constitutionally adequate suitability-for-release determination is required as a prerequisite for detention pending the *Gagnon* II hearing—is imminent. The merits question is integral to Plaintiffs' request for preliminary injunctive relief, and the parties have briefed it even more extensively now than they had at the motion to dismiss stage. The Court did not "forego this core issue," Doc. 112 at 7, and Defendants should leave the Court to manage its docket at the pace and in the sequence it deems fit.

## CONCLUSION

For these reasons, the Court should deny Defendants' motions to reconsider and reach the merits of Plaintiffs' request for preliminary injunctive relief. To remedy ongoing and imminent harms to hundreds of people unconstitutionally trapped at the Allegheny County Jail, the Court should enjoin Defendants from jailing individuals on probation detainers who have not received the requisite constitutional safeguards. *See* Amended Proposed Order.

Dated: May 19, 2023.

/s/ Sumayya Saleh
Sumayya Saleh (D.C. 1743427)
sumayya@civilrightscorps.org
Katherine Hubbard (D.C. 1500503) †
katherine@civilrightscorps.org
Leo Laurenceau (D.C. 90007729) †
leo@civilrightscorps.org
CIVIL RIGHTS CORPS
1601 Connecticut Ave. NW, Suite 800
Washington, D.C. 20009
Phone: (202) 894-6132

/s/ Dolly Prabhu
Dolly Prabhu (PA 328999)
dprabhu@alcenter.org
Jaclyn Kurin (D.C. 1600719) †
jkurin@alcenter.org
Bret Grote (PA 317273)
bretgrote@abolitionistlawcenter.org
ABOLITIONIST LAW CENTER
PO Box 8654
Pittsburgh, PA 15221
412-654-9070

† admitted *pro hac vice*