UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DION HORTON, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> JILL RANGOS, *et al.*, <br><br> Defendants. | Case No. 22-cv-1391 |

**PLAINTIFFS' REPLY TO DEFENDANTS JUDGE JILL RANGOS, FORMER DIRECTOR OF ADULT PROBATION FRANK SCHERER, JUDGE KELLY BIGLEY AND HEARING OFFICERS CHARLENE CHRISTMAS, ROBERT O'BRIEN, STEPHEN ESSWEIN, AND RENAWN HARRIS'S SUPPLEMENTAL BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**INTRODUCTION**

Defendants Judge Rangos, Former Director of Adult Probation Frank Scherer,[1] Judge Bigley, and Hearing Officers Christmas, O'Brien, Esswein, and Harris ("Defendants") continue to mischaracterize this case as being about the totality of Allegheny County's efforts regarding probation. It is not. It is about the lack of due process afforded to detained probationers at *Gagnon* I proceedings and the significant deprivations Defendants' unconstitutional actions cause. Specifically, the injunction Plaintiffs seek pertains to the use of mandatory detention for certain categories of individuals charged with probation violations, a distinction that Defendants fail to

---

[1] Plaintiffs originally brought suit and sought a preliminary injunction against Former Director of Probation Frank Scherer, who no longer heads the agency. Under Fed. R. Civ. P. 25(d), Acting Director Alan Pelton is substituted for Mr. Scherer by operation of law.

1

engage with. This Court should disregard Defendants' irrelevant arguments and enter the requested injunction.

## DISCUSSION

### I. Plaintiffs Have Demonstrated a Violation of *Gagnon*'s Requirements

Defendants attempt to distract the Court by propping up Allegheny County's adult probation system, focusing on various workgroups and reports, and minimizing the significant deprivations caused by unconstitutional incarceration. These attempts fail. Plaintiffs have clearly shown that a mandatory detention policy exists for three categories of cases, that *Gagnon* I proceedings for individuals subject to this policy are unconstitutionally infirm, and that a risk of erroneous deprivation occurs as a result.

#### A. Defendants' Probable Cause Findings Are Insufficient.

Plaintiffs have previously explained that a probable cause determination alone is an insufficient basis to detain someone pending their *Gagnon* II hearing. Doc. 121 at 16-17. But even if such a finding were sufficient, Defendants fail to provide the safeguards necessary for any such probable cause determination to pass constitutional muster. Defendants fail to provide adequate notice, shuttle probationers through incredibly short proceedings masquerading as hearings, frequently silence probationers (and their counsel) who attempt to advocate for release, cite Judges Mariani and Bigley as the reason a person's detainer cannot be lifted, and "never lift[]" the detainer for certain offenses. Doc. 121 at 4-5, 7. A mere checkbox appearing on a form, as Defendants suggest, Doc. 128 at 4, cannot possibly indicate that a constitutionally sufficient probable cause determination has been made.

#### B. Defendants Employ a Mandatory Detention Policy That Permits No Discretion at the *Gagnon* I Proceeding.

Defendants make much hay of the fact that detention is a "last resort," while pointing to participation in programs such as the Safety and Justice Challenge to reduce incarceration and a working group that reviews detainers (though they provided no evidence that any of these efforts actually succeed in reducing incarceration). Doc. 128 at 4. But these efforts are irrelevant to the subjects of this case and this Motion for Preliminary Injunction: those individuals who *are* detained and the lack of process afforded to them.

Defendants repeatedly claim that there is no mandatory detention policy, *e.g.*, *id.* at 5, despite their own admission that numerous people detained as of April 4, 2023, were detained due to a "zero tolerance condition." *Id.* at 11. But in addition to those individuals subject to "zero tolerance" conditions, Plaintiffs provided overwhelming evidence that mandatory detention occurs for individuals accused of committing certain crimes and people whose cases are supervised by Judges Bigley and Mariani. *See* Doc. 121 at 5. These individuals are prohibited from putting forward any evidence on their own behalf; Hearing Officers routinely claim their hands are tied when people subject to mandatory detention come before them. *Id* at 4-5. Again, this matter is not about probationers who are out in the community; it is about those people who are mandatorily detained because they are accused of violating probation only because they are supervised by certain judges or because of the type of offense with which they're charged. Plaintiffs' claim does not hinge on whether Adult Probation maintained a specific list of charges, as Defendants suggest. *See* Doc 128 at 10. Plaintiffs aim to enjoin the practice of detaining people based solely on the nature of the charge, no matter what the charge is, without considering case-specific facts or mitigating circumstances – a practice which Hearing Officer O'Brien readily admits. *See* Doc. 82-1 at 21.

**C. Plaintiffs Provided Significant Evidence of Post-*Gagnon* I Deprivations.**

Case 2:22-cv-01391-NR   Document 130   Filed 06/09/23   Page 4 of 9

Defendants' arguments about the "work" that occurs following a *Gagnon I* is largely irrelevant. Doc. 128 at 7-8. However, their contention that Plaintiffs failed to put forward any evidence regarding any risk of erroneous deprivation is simply incorrect. *Id*. at 8. As previously explained, the Allegheny County Safety and Justice Challenge Report notes an average of 84 days between the resolution of an individual's new charges and their *Gagnon* II proceeding, which does not even account for the days a person spends in custody *before* the resolution of their new charges. *See* Doc. 121 at 9. In addition, two Named Plaintiffs explained to the Court how long they were in custody following their *Gagnon* I proceedings and how this impacted their lives. Plaintiff Oden-Pritchett testified that he spent seven months in custody and that he was released from his probation sentence at his *Gagnon* II hearing, while Plaintiff Stanford testified that he been in custody for seven months at the time of the hearing on Preliminary Injunction, with no *Gagnon* II proceeding yet set. *Id*. Even if this Court were to accept Data Analyst Baidyaroy's declaration (which Plaintiffs disagree with and further address below), 61% of people do *not* have their probation revoked at the *Gagnon* II proceeding, further illustrating the risk of an erroneous deprivation. Baidyaroy Decl., Exhibit 1 at 1 (Def. Ex. 2); *see also* Doc. 90 at 16.

**D. Defendants Ignore *Gagnon*'s Requirements.**

Defendants attempt to justify detention decisions at *Gagnon* I proceedings as being based on "public safety." Doc. 128 at 10. This argument again misinterprets the crux of this matter: what actually occurs at *Gagnon* I proceedings. Whether Defendants believe that Hearing Officers' decisions are based on public safety misses the point entirely; the point is that Plaintiffs and all people similarly situated are entitled to a fair hearing, notice, due process, and an opportunity to be heard at a constitutionally compliant *Gagnon I* proceeding. Plaintiffs have repeatedly shown that this is not the case.

4

Defendants seem to suggest that Plaintiffs are arguing that any such change would not result in different outcomes. *See* Doc 128 at 8. But this is not the relevant question—regardless of the result, due process entitles Plaintiffs to a constitutionally compliant hearing. Also, Plaintiffs have shown that but-for the mandatory detainers, many people incarcerated at the Allegheny County Jail would be eligible for release, *See* Doc. 3 at 5-16; Doc. 82 at 6-7.

**E. Defendants Ignore Courtwatch Observations Regarding Mandatory Detention.**

Plaintiffs' courtwatch witnesses convincingly described the pervasive practices that deprive probationers of their due process rights during the *Gagnon* I proceedings. Defendants' focus on courtwatch testimony regarding length of a proceeding and whether a probationer is permitted to speak, Doc. 128 at 12-13, again ignores that Plaintiffs seek preliminary relief only on behalf of those individuals who are subject to mandatory detention, not all probationers who undergo a *Gagnon* I proceeding. So zooming out to information contained in the courtwatch spreadsheet as a whole is not helpful to this Court's analysis. Also, the fact that a probationer may have spoken during their *Gagnon* I proceeding does not mean that they had a meaningful hearing—as the courtwatchers also explained, Hearing Officers routinely cut people off when they start to advocate for themselves. *See* Doc 121 at 4.

**F. Plaintiffs Have Shown That Hearing Officers Do Not Recommend Lifting Detainers for People Supervised by Judges Bigley and Mariani.**

Similarly, Defendants' characterization of what happens to people whose cases are supervised by Judges Bigley and Mariani misses the mark. Defendants attempt to cast doubt on the no-lift policy Plaintiffs challenge by pointing to Lolo Serrano's declaration as evidence that Hearing Officers recommend detainer lifts for people supervised by Judges Bigley and Mariani. *See* Doc. 128 at 13. Defendants notably fail to mention the numbers: "[f]or individuals supervised by Judges Anthony Mariani and Kelly Bigley, the outcome of the Gagnon I hearing is recorded as

5

a detainer lift in only 6.0% and 3.7% of cases, respectively[.]" Doc 82-1 at 63. These negligible numbers do not disprove the existence of a systemic practice; Plaintiffs need not show that such recommendations are literally never made in order to establish a custom. *See, e.g., Floyd v. City of New York*, 959 F. Supp. 2d 540, 659-60 (S.D.N.Y. 2013) (finding that NYPD had a systemic practice of unconstitutional stop-and-frisk, giving rise to *Monell* liability, even though 6% of stops actually resulted in arrest for a crime). These numbers, in addition to Hearing Officer O'Brien's testimony that it is "institutional knowledge" that Hearing Officers should not recommend detainer lifts for people supervised by Judges Mariani and Bigley, Doc. 82-1 at 15, is sufficient. Put simply, Plaintiffs have shown that for people supervised by Judge Mariani and Bigley, Hearing Officers will not lift the detainer.

### II. Secretary Schiraldi's Declaration Is Reliable.

Defendants claim that they were not afforded an opportunity during discovery to question Secretary Schiraldi or examine his findings. Doc. 128 at 14-18. They additionally claim that Secretary Schiraldi's opinions are contradicted and not reliable. *Id.* Both claims are without merit.

As an initial matter, Defendants' allegations that Plaintiffs withheld the identity of their expert witness and the general topics covered in the expert report are false. Defendants asked Plaintiffs about this in passing during a meet and confer about a new proposed schedule for the preliminary injunction proceedings on November 29, 2022. Plaintiffs immediately responded that they could likely share this information. Plaintiffs then submitted a proposed schedule under which Plaintiffs would submit their supplemental preliminary injunction brief—along with their expert declaration—two weeks before the proposed expert deposition deadline. *See* Doc. 58 at 2. But the Court ultimately adopted Defendant Mariani's proposed schedule, Doc. 61, and it was he who proposed a deposition cutoff that predated Plaintiffs' supplemental brief deadline, Doc. 59 at 7.

6

Plaintiffs are not to blame for Defendants' oversight or the fact that they did not have notice of Plaintiffs' expert before the deposition deadline. In any event, at no point did Defendants did follow up to get information regarding the expert witness.

Secretary Schiraldi's declaration is not inconsistent with the Lolo Serrano's Rule 1006 declaration, either. Secretary Schiraldi accurately stated that Judges Mariani and Bigley "appear to have instituted a 'no-lift' detainer policy for *Gagnon* I hearings" and require that "*all people* whom they have sentenced to probation be detained at their *Gagnon* I hearings if they are arrested for a violation." Doc. 82-1 at 77, 87. As discussed above, this is wholly consistent with the data showing that Hearing Officers recommend detainer lifts in only 6% of Judge Mariani's cases and 3.7% of Judge Bigley's cases. *Id.* at 63. Again, these small percentage of cases do not disprove the existence of a widespread practice. *See* Doc. 91 at 19 (citing authority). Indeed, Defendant Mariani conceded the existence of this practice. Hrg. Tr. at 170:5-9 ("There appears to be a 'don't automatically lift my detainer' preference."). Plaintiffs also provided significant deposition testimony, witness testimony, and discovery that supports the existence of the practice. Doc. 82-1 at 14-18, 63.

Nor is Secretary Schiraldi's declaration inconsistent with courtwatch observations. It is true that a courtwatcher noted that Hearing Officer O'Brien stated in Plaintiff Stanford's *Gagnon* I proceeding that he had inquired to the judge about lifting the detainer. Doc. 128 at 17. But Defendants neglected to mention that the next sentence notes that Hearing Officer O'Brien said that there was nothing he could do at *this* hearing. (Courtwatch Spreadsheet, Row 46 (Def. Ex. 8) (emphasis added)). Defendants also failed to mention that, when noting that the length of the hearing was between 5-10 minutes, the courtwatcher also noted: "As usual, technical difficulties were an issue and HO was using his own personal cell phone." *Id.* Given that these technical

7

difficulties may have taken up some portion of the hearing time, it is not surprising, inconsistent, or pertinent that Mr. Stanford testified that he recalled the hearing lasting less than five minutes.

It is also inaccurate to state that "Secretary Schiraldi's opinions are based almost entirely on allegations with no reliable factual foundation." Doc. 128 at 16. Secretary Schiraldi cites numerous evidence-based studies in his declaration, including information about the foundational goals of probation, the criminogenic effects of pretrial incarceration, the negative impact on sentencing outcomes that pre-trial detention causes, and the destabilizing effects of repetitive pretrial incarceration. Doc 82-1 at 81-88.

In short, Defendants are nitpicking insignificant details rather than rebutting the strong factual evidence Secretary Schiraldi presents in his declaration. This includes evidence about alternative probation practices employed elsewhere in the country that successfully reduced lengthy pretrial incarceration. *Id*. at 93-96. Such information is invaluable to this Court in contextualizing the practices employed by Defendants, considering what changes could successfully reduce unnecessary pretrial incarceration, and demonstrating that such measures are feasible and advance public safety.

**III. The Court Should Disregard Sanjeev Baidyaroy's Declaration.**

Defendants provided Mr. Baidyaroy's Rule 1006 declaration one week before the hearing on Plaintiffs' motion for preliminary injunction. Before then, they had no knowledge of the substance of his possible testimony. In other words, while Plaintiffs were aware of Mr. Baidyaroy's existence, they could not have questioned him about his declaration during the discovery period. Accordingly, deposing him during the discovery period would not have been useful—Plaintiffs would have questioned him in a vacuum without knowledge of, let alone reference to, his declaration.

As Plaintiffs have previously stated, they were deprived of the "opportunity to exploit" the gaps in Mr. Baidyaroy's analysis. Doc. 121 at 5 (internal citations omitted). Defendants try to apply the same logic to Plaintiffs' Rule 1006 Declaration. Doc. 128 at 19. Plaintiffs agree, which is why they presented Lolo Serrano at the preliminary injunction hearing and gave the Court and Defendants an opportunity to question them regarding their Rule 1006 Declaration. Plaintiffs did not have the same opportunity.

**IV. Granting Plaintiffs' Motion for Preliminary Injunction Would Not Insert the Court into State Functions.**

Defendants put forward a number of hypotheticals with the stated aim of illustrating that granting the requested injunction would somehow equate to this Court injecting itself into state court functions. Doc. 128 at 19-20. Again, this misses the mark. Plaintiffs' request to the Court is simple: to make a finding as to what the applicable constitutional standard is, and to issue an injunction requiring that Defendants safeguard that right. How Defendants safeguard that right would be entirely within their purview and would not invite this Court to "interfere with a supervising judge and probation officer's decisions." *See id.* at 19. Such relief would be well within this Court's authority.

s/ Leonard J. Laurenceau
Sumayya Saleh (D.C. 1743427)
sumayya@civilrightscorps.org
Katherine Hubbard (D.C. 1500503) †
katherine@civilrightscorps.org
Leonard J. Laurenceau (D.C. 90007729) †
leo@civilrightscorps.org
CIVIL RIGHTS CORPS
1601 Connecticut Ave. NW, Suite 800
Washington, D.C. 20009
Phone: (202) 894-6132

/s/ Dolly Prabhu
Dolly Prabhu (PA 328999)
dprabhu@alcenter.org
Jaclyn Kurin (D.C. 1600719) †
jkurin@alcenter.org
Bret Grote (PA 317273)
bretgrote@abolitionistlawcenter.org
ABOLITIONIST LAW CENTER
PO Box 8654
Pittsburgh, PA 15221
412-654-9070

† Appearing *pro hac vice* in accordance with Local Rule LCvR 83.2(B)