**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

DION HORTON, et al.,                          )
                                              )
                                              )
                    Plaintiffs                )
                                              )          22-cv-1391-NR
                                              )
        v.                                    )
                                              )
JILL RANGOS, et al.,                          )
                                              )
                                              )
                    Defendants.               )
                                              )

## OPINION

**J. Nicholas Ranjan, United States District Judge**

This case is a putative class action brought by probationers in the Allegheny County, Pennsylvania court system. Plaintiffs allege that the probation procedures implemented by Allegheny County fall short of constitutional due-process requirements because when they were arrested for probation violations, they should have been—but were not—given a meaningful opportunity to seek release from jail pending a final revocation determination.

Before the Court is Plaintiffs' motion for a preliminary injunction. After extensive fact and expert discovery, several rounds of briefing, and a complete evidentiary record—which includes the live testimony of five witnesses and exhibits submitted before, during, and after the April 18, 2023, injunction hearing—the motion is ready for disposition. For the reasons that follow, the Court finds that Plaintiffs are not substantially likely to succeed on the merits and so the Court will deny the motion on that basis.

## FINDINGS OF FACT

The Court makes the following findings based on the evidentiary record before it. This specifically includes any undisputed allegations in the pleadings; the pre-hearing and post-hearing exhibits that were submitted by the parties; the exhibits

- 1 -

that were admitted into evidence at the preliminary-injunction hearing; and the testimony from the injunction hearing.[1]

**The Parties**

1.      Plaintiffs are Dion Horton, Damon Jones, Craig Brownlee, Rahdnee Oden-Pritchett, Tate Stanford, and Elijah Bronaugh.   They were all serving probationary sentences imposed by judges in the Allegheny County Court of Common Pleas.  They were all charged and arrested for violating the terms of their probation. ECF 1, ¶¶ 40-48.

2.      Several of them picked up new charges, which gave rise to their probation violations and also led to separate criminal actions against them.  *Id.*, ¶¶ 40 (Mr. Stanford), 41 (Mr. Bronaugh), 42 (Mr. Horton), 44 (Mr. Jones), 46 (Mr. Brownlee).

3.      The "County Defendants" are Judge Jill Rangos in her capacity as the Administrative Judge of the Criminal Division; Frank Scherer, the former Director of Adult Probation and Parole of Allegheny County; and Orlando Harper, the former Warden of the Allegheny County Jail.  *Id.*, ¶¶ 49-52.

4.      The "Judicial Defendants" are Allegheny Court of Common Pleas Judges Anthony Mariani and Kelly Bigley.  *Id.*, ¶¶ 53-54.

5.      The "Hearing Officer Defendants" are Charlene Christmas, Robert O'Brien, Stephen Esswein, and Renawn Harris.  They are probation officers with

---

[1] The parties dispute whether the Court may consider the expert declaration of Vincent N. Schiraldi, which was submitted by Plaintiffs as pre-hearing Exhibit 23. ECF 121, pp. 8-10; ECF 128, pp. 14-18.  The Court has considered the declaration, but in light of the other evidence presented, limits its consideration of the declaration to Mr. Schiraldi's opinions pertaining to the impact that prolonged detention has on probationers generally.

Allegheny County and aspects of their jobs have included conducting what are referred to as "*Gagnon I*" hearings.[2]  *Id.*, ¶ 55.

**The *Gagnon* hearings generally, and the County's Detainer Policy.**

6.     Once arrested for a probation violation, probationers remain incarcerated until they appear for a *Gagnon I* hearing, which usually occurs within two weeks of the arrest.  ECF 116, 10:21-24, 87:20-23; ECF 1, ¶ 10.

7.     A hearing officer presides over the *Gagnon I* hearing.  ECF 1, ¶ 11.

8.     Hearing officers are employed by Allegheny County Adult Probation and Parole and are neither judges nor attorneys.  *Id.*

9.     Hearing officers receive a copy of each probationer's violation report the day before the *Gagnon I* hearing.  Deposition of Robert O'Brien (O'Brien Dep.), Def. Ex. 7, 52:24-53:9.

10.     Probationers are represented by counsel (usually county public defenders) at the *Gagnon I* hearings.  ECF 116, 12:8-11.  But, for reasons that are unclear from the record, sometimes those attorneys do not confer with their clients in advance of the *Gagnon I* hearings.  *Id.*, 12:10-22, 89:10-12.

11.     At the *Gagnon I* hearings, the probationers are informed of the charge against them.  *Id.*, 12:24-13:7

12.     Probationers are given the opportunity to speak at the *Gagnon I* hearings, even without being formally called as a witness.  *Id.*, 68:11-13.

---

[2] As discussed below, a *Gagnon I* hearing is the initial preliminary hearing where the probationer is given notice of the charge, and a hearing officer determines whether there is probable cause that the probationer violated his probation.  *See Gagnon v. Scarpelli,* 411 U.S. 778 (1973).  If probable cause is found, then the probationer appears for the *Gagnon II* hearing, which, in Allegheny County, is before a judge. Deposition of Frank Scherer (Scherer Dep.), Def. Ex. 6, 23:8-17.  The *Gagnon II* hearing typically provides a probationer a more fulsome opportunity to defend against the charges, before a judge determines whether a violation was committed and, if appropriate, imposes a sentence for that violation.  *See* ECF 116, 95:8-14.

13.     Probationers' counsel also can speak, and present evidence.  O'Brien Dep., Def. Ex. 7, 170:6-10.

14.     *Gagnon I* hearings can be relatively short, and generally may last between two and 20 minutes, but that may also depend on the specific hearing officer who conducts the hearing.  ECF 3-1, Ex. 3 at ¶ 9; O'Brien Dep., Def. Ex. 7, 74:17-75:3 ("[M]y hearings go long…I'm very confident of that.").

15.     Hearing officers fill out a form after the *Gagnon I* hearing that memorializes whether they have determined that probable cause exists that the probationer has violated his or her probation.  Plaintiffs' Ex. 19.

16.     With respect to the probable-cause determination, the hearing officer can make several findings, including whether probable cause has been established, whether it has not been established, and when the *Gagnon II* hearing should be scheduled.  *Id.*

17.     In addition to the probable-cause determination, the hearing officers may make recommendations as to whether a probationer should be released pending the *Gagnon II* hearing (*i.e.*, that the probationer's probation detainer should be lifted). This decision is guided by a formal Detainer Policy, among other policies.  *Id.*

18.     The Detainer Policy was made effective November 20, 2019, and was approved by Judge Rangos, as the administrative judge, and Mr. Scherer, as the then-director of probation.  Detainer Policy, Def. Ex. 3, p. 1.

19.     In 2018, the Adult Probation Office engaged in a Safety and Justice Challenge, which was a program to reduce the length and number of probation detainers.  Declaration of Alan Pelton (Pelton Decl.), Def. Ex. 1, ¶¶ 12-13.

20.     The Adult Probation Office instituted the Detainer Policy in collaboration with the Safety and Justice Challenge to "have a consistent practice in deciding whether to lodge a detainer for a violation and to reduce incarceration[.]" *Id.*, ¶ 14.

21.     The Detainer Policy provides the hearing officers with criteria to determine whether the probationer should be detained pending the *Gagnon II* hearing.  Detainer Policy, Def. Ex. 3, p. 1.

22.     For example, under the Detainer Policy, the probationer must be detained if he violated a zero tolerance or mandatory detention court condition, or he has a new charge that represents a serious threat to public safety.  *Id.*

23.     Zero tolerance and mandatory court conditions depend on the sentencing judge's description of probation conditions; for example, a judge may impose as a mandatory condition a "no victim contact" condition for a domestic violence sentence.  O'Brien Dep., Def. Ex. 7, 99:21-100:16.

24.     That said, it is somewhat rare for zero-tolerance conditions to be imposed by sentencing judges.  Pelton Decl., Def. Ex. 1, ¶ 37 ("As of April 4, 2023, there were 399 probationers with zero tolerance sentencing conditions, which is approximately 4% of total supervision population.").

25.     For other violations (*i.e.*, "lower-level technical violations" and "arrests for non-violent offenses"), the Detainer Policy instructs the hearing officer to exhaust non-custodial options, such as halfway houses, treatment facilities, and release on electronic monitoring.  Detainer Policy, Def. Ex. 3, p. 1.

26.     The hearing officers then, based on the Detainer Policy, make a recommendation as to release on the violation report form: (1) lift detainer; (2) remain detained; (3) transfer to alternative housing; or (4) recommend for the Drug and Alcohol Diversion Program.  O'Brien Dep., Def. Ex. 7, 62:2-10.

27.     Hearing officers may, in some instances, base their recommendation on the nature of the charges, without as much emphasis placed on the underlying facts giving rise to the charge.  *Id.*, 157:5-158:13.

28.     Hearing officers can keep a probationer detained after the *Gagnon I* hearing, but, if that occurs, under the Detainer Policy, the judge is notified of that decision.  Deposition of Frank Scherer (Scherer Dep.), Def. Ex. 6, 102:14-17.

29.     If a judge disagrees with the hearing officer's recommendation, the judge will notify the probation office through the court liaison.  *Id.*, 156:15-158:17.

30.      A judge must sign off on every request to lift or transfer a detainer.  *Id.*, 102:4-13.

31.     Two particular judges (Judges Bigley and Mariani) allegedly have their own "no lift" policies, where they have informed the hearing officers that detainers shouldn't be lifted for any probation violations.  O'Brien Dep., Def. Ex. 7, 112:5-12; Scherer Dep., Def. Ex. 6, 96:16-97:1.

32.     While Defendants contest whether there is such a no-lift policy for Judges Bigley and Mariani, the statistics bear out that these judges rarely lift detainers, and it appears that these judges, at a minimum, have a routine practice to not lift detainers when a probationer has been arrested on a warrant.  O'Brien Dep., Def. Ex. 7, 112:13-16, 127:11-25; Scherer Dep., Def. Ex. 6, 159:5-161:8.

33.     Judge Mariani lifts probation detainers in approximately 6 percent of cases.  ECF 116, 77:22-78:5.

34.     Judge Bigley lifts probation detainers in approximately 3.7 percent of cases.  *Id.*, 78:1-2, 6-7.

35.     That said, overall, in Allegheny County, detention appears to be the exception rather than the rule.  As of April 4, 2023, just 6% of people being supervised by Adult Probation in Allegheny County were detained in the Allegheny County Jail or alternative housing sites in the county.   Declaration of Sanjeev Baidyaroy (Baidyaroy Decl.), Def. Ex. 2, Exhibit 1, p. 2.

36.     As of April 4, 2023, 2,308 people on probation had new pending criminal charges and only 510 of them were detained.  *Id.*

**Plaintiffs' *Gagnon I* hearings and court watcher observations**

37.    In addition to the declarations that were filed, two Plaintiffs and two court watchers testified at the preliminary-injunction hearing, and the Court makes additional findings based on that testimony.

38.    While on probation, Plaintiff Tate Stanford was arrested in September 2022 for possession of a firearm and having marijuana.  ECF 116, 8:25-9:5, 10:4-5.

39.    Mr. Stanford had a *Gagnon I* hearing approximately two weeks after his arrest.  *Id.*, 10:21-24.

40.    In Mr. Stanford's opinion, he was not able to prepare for his hearing because he only received notice of it right before it happened.  *Id.*, 10:25-11:2, 11:12-17.

41.    There was a hearing officer, a public defender, and a probation officer at Mr. Stanford's hearing, but he was not able to speak with the public defender before or after the hearing.  *Id.*, 12:10-22.

42.    At the hearing, the hearing officer read Mr. Stanford's pending charges and told him that he would be detained because he was supervised by Judge Mariani. *Id.*, 12:23-13:7.

43.    Mr. Stanford's *Gagnon I* hearing lasted three to five minutes.  *Id.*, 14:20-21.

44.    Mr. Stanford was not initially detained pending his *Gagnon II* hearing; rather, at some point, he was released to a halfway house.  *Id.*, 15:5-8.

45.    However, Mr. Stanford was ultimately re-arrested and detained at the Allegheny County Jail because he got into a verbal altercation while staying at the halfway house.  *Id.*, 16:6-10.

46.    At some point, Mr. Stanford's counsel filed a motion to lift his probation detainer.  *Id.*, 33:13-15.

47.     Mr. Stanford remained detained, but it appeared that was the case because he was waiting on an opening at an in-patient substance-abuse treatment facility. *Id.*, 18:18-23, 33:24-35:5.

48.     Mr. Stanford's criminal defense attorney did not testify at the preliminary-injunction hearing.

49.     Plaintiff Rahdnee Oden-Pritchett was also on probation when he was arrested for burglary, criminal trespassing, simple assault, and a PFA violation. *Id.*, 86:22-87:4.

50.     Mr. Oden-Pritchett's *Gagnon I* hearing was held around 12 days after his arrest, and he received no advance notice before the hearing; he was simply brought to the "video call room." *Id.*, 87:20-88:3.

51.     Mr. Oden-Pritchett was not able to meet with the public defender before his *Gagnon I* hearing. *Id.*, 89:10-12.

52.     At the hearing, the hearing officer told Mr. Oden-Pritchett that he would be detained pending the outcome of his charges. *Id.*, 89:24-90:11.

53.     Mr. Oden-Pritchett's *Gagnon I* hearing lasted "probably not even five minutes." *Id.*, 91:17-20.

54.     Mr. Oden-Pritchett's counsel discussed with him the possibility of filing a motion to lift his probation detainer, but it appears counsel did not do so for strategic reasons. *Id.*, 96:10-17.

55.     After Mr. Oden-Pritchett's new criminal case resolved, he had his *Gagnon II* hearing, and reached an agreement of time served on his probation violation. *Id.*, 93:15-95:10.

56.     Mr. Oden-Pritchett's criminal defense attorney did not testify at the preliminary-injunction hearing.

57.    The court watch program at the Abolitionist Law Center trains volunteers, referred to as court watchers, to watch court proceedings, including *Gagnon I* hearings, and record their observations. *Id.*, 39:18-41:1.

58.    Dr. Redcross, who observed many *Gagnon* I hearings, testified that, in her opinion, the probationers were not truly heard at the hearings. *Id.*, 44:10-15.

59.    Dr. Redcross further testified that when a probationer tried to explain themselves, at the hearing, they were often not allowed to fully explain themselves. *Id.*, 45:5-11.

60.    Dr. Redcross testified that she "felt that people were not being listened to." *Id.*, 45:21-22.

61.    Dr. Redcross testified that the probationer's public defender would also sometimes speak at the *Gagnon I* hearing. *Id.*, 57:10-12.

62.    Dr. Redcross wasn't privy to the materials that the hearing officer had; she is not an attorney; and did not have knowledge of whether defense counsel strategically were opting not to contest probable cause or otherwise put on a more fulsome case at the *Gagnon I* hearings. *Id.*, 56:13-15, 51:20-24, 54:4-55:7, 48:17-23 ("I have never seen the chart the probation officer is going by.").

63.    Emma Fenstermaker, a volunteer court watcher, testified that at the *Gagnon I* hearing, "the hearing officer would read the charges, either they would read the charges or pass it off to the probation officer to read the charges, and then the public defender would make arguments or they are supposed to make arguments in favor of the defendant, and then the defendant would be given a chance to speak." *Id.*, 60:4-9.

64.    Ms. Fenstermaker also testified that the probationers were allowed to speak at the hearing, although sometimes the hearing officer would stop them from speaking if they spoke for more than a few minutes. *Id.*, 60:12-21.

65.     Ms. Fenstermaker wasn't privy to the materials that the hearing officers had before them, and she also is not an attorney.  *Id.*, 67:17-68:4, 66:5-9.

**Impact of prolonged detention on Plaintiffs**

66.     Plaintiffs were impacted in various ways by their detention.  Mr. Stanford no longer has a stable housing situation to return to—he had been living with a roommate but does not know if that space is still available.  *Id.*, 18:24-19:8.

67.     Mr. Stanford has also lost government assistance, he has been unable to pay his bills, and his relationships with his family and loved ones has been strained. He is worried about his younger sister because his mother, who is his sister's primary caretaker, has brain cancer.  *Id.*, 19:25-20:13.

68.     Mr. Stanford has also experienced a worsening of his mental health because of his incarceration.  *Id.*, 20:16-22:13.

69.     Mr. Oden-Pritchett also lost an opportunity for housing, had to drop out of school, missed important moments with his children, and experienced a worsening of a medical condition (psoriasis) and his mental health.  *Id.*, 97:20-103:10.

70.     Plaintiff Craig Brownlee was detained between his *Gagnon I* and *Gagnon II* hearings.  Declaration of Craig Brownlee (Brownlee Decl.), Plaintiffs' Ex. 8, ¶¶ 3-4.

71.     Due to Mr. Brownlee's detention, he was unable to spend time with is four-year-old son.  While his son does not live with him, Mr. Brownlee sees him frequently and not being able to spend that time together has been hard for both of them.  *Id.*, ¶ 8.

72.     Mr. Brownlee also has an elderly mother who relies on him to help with shopping for food, so his detention negatively impacted her life, as well.  *Id.*, ¶ 9.

73.     Plaintiff Dion Horton's medication was unexpectedly stopped during his detention.  Declaration of Dion Horton (Horton Decl.), Plaintiffs' Ex. 6, ¶ 15.

74.     Mr. Horton also had to have a tooth pulled because a root canal was not available at the jail.  *Id.*, ¶ 14.

75.     Mr. Horton also missed the birth of his second child.  *Id.*, ¶ 8.

76.     Plaintiff Damon Jones lost his housing, his possessions, and his ability to receive demolition and cleaning jobs due to his detention.  Declaration of Damon Jones (Damon Decl.), Plaintiffs' Ex. 7, ¶¶ 13, 15.

77.     More generally, there is little doubt that detention can disrupt probationers' lives.  It can cause loss of employment, disruption to family relationships, and disruption to treatment.  Declaration of Vincent Schiraldi (Schiraldi Decl.), Plaintiffs' Ex. 23, ¶ 37.

78.     Detention also has the potential to increase recidivism and can result in lost wages and increase poverty.  *Id.*, ¶¶ 39, 41.

## PROCEDURAL BACKGROUND

Plaintiffs filed their complaint and motion for preliminary injunction on October 2, 2022.  ECF 1; ECF 2.  The complaint sets forth four counts: Right to Procedural Due Process Under the Fourteenth Amendment to the United States Constitution (Count I), Right to Procedural and Substantive Due Process Under the Fourteenth Amendment to the United States Constitution (Prolonged Detention) (Count II), Right to Procedural Due Process Under the Pennsylvania Constitution (Count III), and Right to Procedural Due Process Under the Pennsylvania Constitution (Prolonged Detention) (Count IV).  ECF 1.

Defendants filed motions to dismiss.  ECF 49; ECF 62; ECF 64.  On April 14, 2023, the Court denied the motions, rejecting Defendants' procedural challenges.  ECF 104.  With respect to Defendants' arguments that the complaint failed to state a claim and that they were entitled to immunity, the Court found that the record was

not yet developed to decide those issues, and so denied relief on that basis, but without prejudice to re-raising those arguments at a later stage. *Id.*[3]

Pursuant to the Court's case management order, as modified, the parties engaged in extensive fact and expert discovery for two months. The Court then held a one-day evidentiary hearing on Plaintiffs' preliminary-injunction motion on April 18, 2023. ECF 106; ECF 116. Prior to the hearing, the parties submitted 52 exhibits to the Court. During the hearing, the Court heard evidence and testimony from five witnesses, followed by oral argument from counsel. ECF 116. Following the hearing, the parties filed supplemental briefs supporting and opposing the preliminary-injunction motion, which included additional exhibits. ECF 121; ECF 126; ECF 127; ECF 128; ECF 130; ECF 131; ECF 132.

## LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008) (citations omitted). Under Third Circuit precedent, "a movant for preliminary equitable relief must meet the threshold for the first two 'most critical' factors: it must demonstrate that it can win on the merits . . . and that it is more likely than not to suffer irreparable harm in the absence of preliminary relief. If these gateway factors are met, a court then considers the remaining two factors[.]" *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017), *as amended* (June 26, 2017). "The decision to grant or deny a preliminary injunction is within the sound discretion of the district court." *Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Attorney Gen. New Jersey*, 910 F.3d 106, 114 (3d Cir. 2018) (citation omitted). However, preliminary-injunctive relief is

---

[3] Defendants filed motions for reconsideration of the Court's denial of their motions to dismiss, which remain pending. ECF 111; ECF 113; ECF 114.

an "extraordinary remedy" that "should be granted only in limited circumstances." *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) (cleaned up).

To begin its analysis, the Court must first determine if any injunction issued would be mandatory or prohibitory. *C.G. by & through P.G. v. Saucon Valley Sch. Dist.*, 571 F. Supp. 3d 430, 439 (E.D. Pa. 2021). "A prohibitory injunction, the more common type, maintains the status quo until a decision on the merits of a case is rendered." *Id.* at 438 (cleaned up). A mandatory injunction "alters the status quo by commanding some positive action or providing the moving party with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits." *Id.* (cleaned up).

This distinction matters because it affects the burden that plaintiffs must meet to show a likelihood of success on the merits. *Id.* at 439. "For a prohibitory injunction, the moving party must show that his or her likelihood of success on the merits are significantly better than negligible but not necessarily more likely than not." *Id.* (cleaned up). By contrast, for mandatory injunctions, a heightened standard applies. *Hope v. Warden York Cnty. Prison*, 972 F.3d 310, 320 (3d Cir. 2020). For that relief, the moving party must show "a substantial likelihood of success on the merits and that their right to relief is indisputably clear." *Id.* (cleaned up).

Here, the proposed order to Plaintiffs' preliminary-injunction motion clearly establishes that the injunction they seek is mandatory. The order asks for the Court to impose a new set of Bail Reform Act-type procedures on Allegheny County that would be aligned with what federal courts do. ECF 121-1.[4] This fundamentally alters the status quo. As such, the heightened standard of review applies.

---

[4] The full text of Plaintiffs' proposed order is as follows:

It is hereby **ORDERED** that County Defendants are enjoined from detaining at the Allegheny County Jail any putative mandatory detention subclass member who has been arrested for an alleged violation of probation and who has not received,

## DISCUSSION & ANALYSIS

**I.    Plaintiffs cannot demonstrate a substantial likelihood of success on the merits of their claims because there is no constitutional right to an initial detention determination.**

Plaintiffs' sole claim is essentially that federal and state due process requires that once they were arrested for probation violations, they should have been given, but were not, a meaningful opportunity to seek release from jail pending a final revocation determination.

---

at a minimum, the procedural and substantive safeguards delineated below. For purposes of the subclasses, "mandatory detention" refers to circumstances in which individuals are automatically detained because they 1) are accused of violating a zero tolerance condition of probation; 2) are supervised by Judge Mariani or Judge Bigley; or 3) are accused of a new charge "that represents a serious threat to public safety."

     **A. Substantive Standard.** No person may be detained pending their Gagnon II hearing pursuant to a mandatory detention policy or practice. Putative mandatory detention subclass members may not be detained unless a judicial officer has made a finding, accompanied by all procedural requirements in subsection B of this order, that 1) probable cause exists to believe that they violated their probation, and 2) no condition or combination of conditions of release will reasonably protect the safety of the community or ensure that the person returns to court.

     **B. Procedural Requirements.** In order to determine whether a person's ongoing detention is necessary in accordance with the standard above, the person must be given a meaningful, individualized hearing within a reasonable time period after arrest that includes:

        1. Representation by counsel;
        2. Notice to the individual of the purpose of the hearing;
        3. A neutral and detached decision-maker, i.e., a judicial officer;
        4. The opportunity to be heard and present evidence;
        5. The opportunity to rebut evidence presented by Probation;
        6. Factual findings on the record, including a statement of reasons for the outcome, including a) the necessity of detention in relation to the State's compelling interests (i.e., protecting community safety and against non-appearance); and b) the least restrictive conditions of release that will reasonably protect community safety and ensure return to court.

ECF 121-1.

While the Court has reviewed and considered the extensive evidentiary record, ultimately, the motion before the Court is resolved almost entirely on the law.  At its core, Plaintiffs' due-process claims essentially distill down to this question: are probationers entitled to an initial detention hearing and bail or release determination when arrested for a probation violation?

In federal court, that is certainly the standard.  Under Federal Rule of Criminal Procedure 32.1, a federal probationer is arrested, afforded counsel, and brought before a federal magistrate judge, for an initial appearance, probable-cause determination, and individualized detention determination.  On the question of detention, the magistrate judge must weigh the relevant factors under the Bail Reform Act, and can only order the probationer detained if the judge finds by "clear and convincing evidence that the person will not flee or pose a danger to any other person or to the community rests with the person."  Fed. R. Crim. P. 32.1(a)(6).  The magistrate judge makes the appropriate findings on the record, and then the district judge—typically after consultation with counsel—will promptly schedule a final revocation hearing.  Fed. R. Crim. P. 32.1(b).

This is the precise procedure that Plaintiffs now ask the Court to impose as a form of injunctive relief, but applicable to state-court probationers in Allegheny County.  ECF 121-1.

Currently, the procedure for probationers in Allegheny County is different than the one in federal courts.  In Allegheny County, once a probationer is detained, he or she is afforded counsel and then brought before an independent probation hearing officer.  That probation hearing officer determines whether there is probable cause for the violation (though the parties dispute how thorough that determination is).  The hearing officer also makes certain detention/release decisions, based on the probation office's Detainer Policy.

For example, under that policy, certain offenses are deemed to be "zero tolerance," and so those probationers will be automatically detained pending the final hearing.   For lower-level technical offenses and substance-abuse violations, the hearing officer looks to non-custodial options.   Two judges (Judges Bigley and Mariani) allegedly have their own separate "no lift" policies, where they have informed the probation office that detainers shouldn't be lifted for probation violations.   After this initial hearing, the probationer may remain detained, and, based on mostly strategic decisions of counsel, counsel confers with the trial judge for scheduling the final hearing.   Detainer Policy, Def. Ex. 3.

Plaintiffs contend that the federal and state constitutions[5] require more protections than Allegheny County provides.   But they are wrong under the well-settled Supreme Court precedents of *Morrissey* and *Gagnon*.

Due process as applied to probationers requires that an independent officer determine at the *Gagnon I* hearing "whether there is probable cause or reasonable ground to believe that the arrested parolee has committed acts that would constitute a violation of parole conditions." *Morrissey v. Brewer*, 408 U.S. 471, 485 (1972).   The probationer must be given notice of this hearing and its purpose, and is permitted to speak and present exhibits or individuals to testify.   *Id.* at 486-87.   The hearing officer then determines whether probable cause exists to hold the probationer until a final revocation hearing.   *Id.* at 487.   The final revocation hearing (the *Gagnon II* hearing)

---

[5] The parties' briefing focuses exclusively on federal law, and no party has argued that the Pennsylvania state constitution provides greater or lesser rights.   As such, the Court finds that the due-process rights guaranteed by the Pennsylvania Constitution as applied in this case are co-extensive with those under the U.S. Constitution.   *See Tulp v. Educ. Comm'n for Foreign Med. Graduates*, 376 F. Supp. 3d 531, 539 n.3 (E.D. Pa. 2019) ("Pennsylvania law generally treats the Due Process Clause of the United States Constitution and Article I, Section 9 of the Pennsylvania Constitution as coextensive." (cleaned up)).

is a "somewhat more comprehensive hearing prior to the making of the final revocation decision." *Gagnon v. Scarpelli*, 411 U.S. 778, 782 (1973).

Nothing in these decisions requires that a probation officer or judge also make a bail or release decision as part of the *Gagnon* hearings. Indeed, *Morrissey* presumes that so long as the procedures for the hearings are satisfied, the probationer can be detained with really no further inquiry or procedure at all. *Morrissey*, 408 U.S. at 487 ("Such a [probable cause] determination would be sufficient to warrant the parolee's continued detention and return to the state correctional institution pending the final decision.").

Plaintiffs here essentially ask the Court to create a new right, by layering onto the *Gagnon* hearings a right to a bail-type or detention-type analysis, where a judge or a hearing officer would consider risk of flight and danger to the community before making a determination to release the probationer pending a final hearing. Similar arguments have been tried before, and courts have rejected them

For example, in *Faheem-El v. Klincar*, the Seventh Circuit held "that due process does not require that parolees receive a bail hearing conducted by a judicial officer prior to the conclusion of the revocation proceedings." 841 F.2d 712, 723-24 (7th Cir. 1988). In that context, the court found that the state's compelling interest in regulating parole outweighed the parolee's liberty interest. *Id.* at 724. The court did not, however, decide whether due process required some other type of release-suitability hearing, such as by a probation or parole hearing officer or as part of the revocation hearings. *Id.* at 727. But the Southern District of New York recently did. *Roberson v. Cuomo*, 524 F. Supp. 3d 196, 203 (S.D.N.Y. 2021), *vacated and remanded on other grounds sub nom. Roberson v. Hochul*, No. 21-877, 2022 WL 19224518 (2d Cir. Sept. 27, 2022).

In *Roberson*, the court explained that a release-suitability hearing, even by parole officials, would not "add value [to] existing procedures" that were already had

in place for parolees.  *Id.*  In assessing the parolees' due-process claim under the familiar *Mathews* balancing test, the court concluded that the risk of an erroneous deprivation (*i.e.*, a parolee being wrongly accused of a violation) would not be mitigated by a release determination.  The court stated:

> A parolee's suitability for release – which Plaintiffs have couched in terms of flight risk and public safety risk – has little to no bearing on whether s/he violated a condition of parole. . .  In other words, the 'process' Plaintiffs assert is 'due' to parolees whose liberty interest is conditioned on their compliance with parole rules does not track that condition.  Thus, it adds no value to the relevant inquiry, which is whether a parolee violated parole.

*Id.* at 210 (cleaned up).  The court further found that the government "has a strong public interest in ensuring that persons who are released on parole [and probation] comply with the conditions of their release, and in protecting society from those who will not."  *Id.* at 211.

The Court finds both *Faheem-El* and *Roberson* persuasive in this case.[6]  As in *Faheem-El*, the Court concludes that there is no due-process right to a judge making an individualized release decision at the *Gagnon I* hearing, which is what Plaintiffs request as part of their proposed order for injunctive relief.  And as in *Roberson*, the Court concludes that there is similarly no due-process right to a hearing officer or some type of probation official making such a release decision, based on an assessment of the *Mathews* factors, as was done by the court in *Roberson*.

---

[6] Although *Faheem-El* and *Roberson* both concerned parolees, not probationers, the analysis applies equally to both groups, given that probationers have the same conditional liberty interest as parolees.  *Gagnon*, 411 U.S. at 782 ("Petitioner does not contend that there is any difference relevant to the guarantee of due process between the revocation of parole and the revocation of probation, nor do we perceive one.").

Plaintiffs attempt to get around these cases by arguing that other Supreme Court decisions have layered onto *Morrissey* and *Gagnon* a constitutional right to a bail-like or release-suitability determination.  But the decisions that they cite[7] are inapposite because they arise in a materially different context, or do not go as far as Plaintiffs here suggest.  A few points about those cases.

*First*, the cited decisions, for the most part, arise in the pre-trial detention context.[8]  That is significant, of course, because pre-trial detainees have a complete liberty interest, not a conditional one, like a probationer.  *Morrissey*, 408 U.S. at 480 ("Revocation deprives an individual, not of the absolute liberty to which every citizen is entitled, but only of the conditional liberty properly dependent on observance of special parole restrictions.").  Moreover, the purposes of probation are very different.  At the pre-trial stage, considerations of risk of flight and danger to the community are more important.  At the probation-revocation stage, while those interests might be relevant, the government's primary interests concern supervision and rehabilitation, and thus require that the probation officer and supervising judge have much more decision-making flexibility than in a pre-trial setting where courts are dealing with defendants who are presumed innocent.  *Roberson*, 524 F. Supp. 3d at 211; *see also Ross v. Young*, 736 F. Supp. 1525, 1527 (E.D. Mo. 1990) (concluding that a Missouri statute that "blanketly deni[ed] bail to parolees arrested for alleged parole violations" did not violate due process).

---

[7] *Zadvydas v. Davis*, 533 U.S. 678 (2001); *Kansas v. Hendricks*, 521 U.S. 346 (1997); *Foucha v. Louisiana*, 504 U.S. 71 (1992); *United States v. Salerno*, 481 U.S. 739 (1987); *Schall v. Martin*, 467 U.S. 253 (1984); *Bell v. Wolfish*, 441 U.S. 520 (1979); *Jackson v. Indiana*, 406 U.S. 715 (1972).

[8] The one cited case that did not involve pre-trial detention is *Zadvydas*, which involved post-removal detention of aliens.  The Court finds that this case is still inapposite, as the issue there centered exclusively on whether the statute at issue allowed for unlimited and potentially permanent detention of an alien.  *Zadvydas*, 533 U.S. at 690.

*Second*, the cited cases concerned challenges to statutes that prescribed when detainees could and couldn't be released. *See Zadvydas*, 533 U.S. at 699 (holding that Immigration and Nationality Act did not authorize indefinite or permanent detention of aliens subject to removal); *Hendricks*, 521 U.S. at 357 (recognizing that a Kansas statute only allowed civil commitment proceedings "when a person 'has been convicted of or charged with a sexually violent offense,' and 'suffers from a mental abnormality or personality disorder which makes the person likely to engage in the predatory acts of sexual violence.'" (quoting Kansas Sexually Violent Predator Act, Kan. Stat. Ann. § 59-29a02(a)); *Foucha*, 504 U.S. at 78-79 (holding that Louisiana statute could not allow the government to confine a person using civil commitment if that person is not mentally ill); *Salerno*, 481 U.S. at 750-751 (holding that the Bail Reform Act properly balanced the liberty interests of pretrial detainees with the government's interest because pretrial detainees could only be held after a showing that "an arrestee presents an identified and articulable threat to an individual or the community[.]"); *Schall*, 467 U.S. at 269-271 (upholding New York statute (FCA § 320.5) permitting pretrial detention of juveniles after a showing that the juvenile might commit further crimes); *Bell*, 441 U.S. 520 (upholding security restrictions for pretrial detainees); *Jackson*, 406 U.S. at 729-730 (holding that Indiana statute subjecting certain inmates to a "more lenient commitment standard" and "more stringent standard of release" violated the Fourteenth Amendment).

In each of those cases, the Supreme Court decided whether the statutory release procedures and criteria complied with due process. Some of those statutes set forth criteria such as risk of flight and danger to the community as considerations in making release decisions. Importantly, none of the decisions went so far as to mandate, in a vacuum, that detainees have a standalone right to receive a release determination predicated on risk of flight and danger to the community. Put differently, just because the Supreme Court in *Salerno*, for example, held that the

procedures under the Bail Reform Act satisfied due process, it does not mean that the absence of those procedures here offends due process.

*Third*, of all the cases Plaintiffs cite, this case is probably closest to *Schall*, where the Supreme Court determined that, in the context of the juvenile system, the state's "combined interest in protecting both the community and the juvenile himself from the consequences of future criminal activity" outweighed the juveniles' liberty interest where pretrial detention was predicated on a finding of "serious risk." *Schall*, 467 U.S. 263-66.  Likewise, in the probation context, "a person under sentence for a conviction of a crime who cannot or will not follow the rules [of probation] presents a danger to society without more." *Roberson*, 524 F. Supp. 3d 196 at 206.  This danger allows the state to detain probationers who are suspected of violating their probation once the state has made a probable-cause determination.  The state's "overwhelming interest" in being able to return an individual to imprisonment if he has failed to abide by the conditions of parole or probation, *Morrissey*, 408 U.S. at 483, outweighs any need for a bail-like determination.

Finally, while the Court has held that there is no right to a bail-like determination at the *Gagnon I* hearing, this doesn't mean that Defendants have provided no procedures to address release of probationers.  Indeed, Defendants have gone beyond the constitutional minimum in adopting the Detainer Policy.  And the Court finds as credible at least certain of the statistics showing that detention is rare for probation violations, and that non-detention alternatives are often sought.  Baidyaroy Decl., Def. Ex. 2, Exhibit 1, p. 2.  This is also borne out in some of the testimony at the injunction hearing concerning Plaintiffs—for example, while Mr. Stanford complained about his prolonged detention, after he was initially detained, he was released to a halfway house before he allegedly violated the rules and was then re-arrested.  ECF 116, 15:3-5; 16:6-10.  From the snapshot that the Court has seen here, the application of the Detainer Policy reflects what the Supreme Court in

*Morrissey* and *Gagnon* envisioned—a more flexible process to account for the ups and downs of supervision and rehabilitation.  *Morrissey*, 408 U.S. at 481 ("due process is flexible and calls for such procedural protections as the particular situation demands.").[9]

In sum, there is no federal or state constitutional right that mandates the process that Plaintiffs now seek with their preliminary injunction.  Because of that, they are not substantially likely to succeed on the merits, and cannot meet the threshold requirement for obtaining preliminary-injunctive relief.

## II.   Plaintiffs' suggestions that the current *Gagnon* hearings are inadequate also do not warrant injunctive relief.

The complaint makes clear that the claims in this case focus on the mandatory detention policies in Allegheny County.  However, in the course of the parties' briefing and during the injunction hearing, there were suggestions that Allegheny County fails to comply with *Morrissey* and *Gagnon* for three reasons.  To the extent that

---

[9] In light of *Morrissey* and *Gagnon*, the Court finds that it need not engage in a *Mathews*-type due-process analysis.  But if the Court were required to do so, it would find that the current procedures in place satisfy due process.  Under *Mathews*, courts consider three factors to determine "what process is due to an individual in a particular circumstance: (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."  *Roberson*, 524 F. Supp. 3d at 203.  Here, Plaintiffs have a limited private interest due to their status as probationers, and their proposed procedural safeguards would not add value to the procedures already in place, which already appear to result in low detention rates.  Defendants' interest in probationers' detention pending the *Gagnon II* hearing is substantial given the supervisory nature of probation.  As to increased administrative and fiscal burdens on Defendants, while the record is not fully developed, in light of the number of probationers in the Allegheny County system and the limited number of judges, it would seem that Plaintiffs' requested injunction (which includes an individualized judicial determination as to release suitability at the *Gagnon I* hearing) would create significant administrative and fiscal problems.

Plaintiffs are making such a standalone claim, though, the Court finds that it is unlikely to succeed on the merits.[10]  The Court will discuss each of the claimed "deficiencies," in turn.

First, Plaintiffs claim that they do not receive sufficient notice before the *Gagnon I* hearing, and that their access to counsel is limited.  ECF 116, 54:10-21.  However, the evidence is clear that probationers are given notice of the charges, at least at the hearing itself, which comports with *Morrissey* and *Gagnon*.  *Gagnon*, 411 U.S. at 786; ECF 116, 12:23-13:1.  Additionally, probationers are afforded counsel.  While there was some testimony at the injunction hearing indicating that certain probationers were not able to speak to their attorney before their *Gagnon I* hearings, ECF 116, 12:17-19, there is no evidence before the Court that Defendants' policies caused this, as opposed to something else, such as the practices of the local public defender's office.  In fact, Frank Scherer, the former Director of Adult Probation in Allegheny County, testified at his deposition that individuals not having time to meet with their counsel is "not a probation issue" but "more of an issue for the Public Defender's Office."  Scherer Dep., Def. Ex. 6, 19:1-9.  Significantly, no one from the Public Defender's Office testified during the injunction hearing.

Second, Plaintiffs allege the *Gagnon I* hearing is perfunctory because no real evidence is presented, and probationers do not have an opportunity to speak.  At the

---

[10] As the Court understands it, Plaintiffs' complaints about the current *Gagnon* procedures are not standalone claims.  It appears that the theory is that the absence of some type of detention/release process in conjunction with otherwise deficient *Gagnon* hearing procedures creates or exacerbates a constitutional problem.  But, as discussed above, there is no constitutional right to a detention or release decision at the *Gagnon* hearings.  And if Plaintiffs are right that the *Gagnon* hearings are deficient, that doesn't mean that the remedy would be to impose a new detention/release policy.  Rather, the remedy would be an injunction to order that Defendants comply with *Gagnon*.  *Meyer v. CUNA Mut. Ins. Soc.*, 648 F.3d 154, 170 (3d Cir. 2011) ("injunctive relief should be no broader than necessary to provide full relief to the aggrieved party." (cleaned up)).

injunction hearing, the Court heard from multiple court watchers, who were volunteers that observed many *Gagnon I* proceedings.  For example, Dr. Redcross testified that "[o]ften, the defendants would try to explain" the facts of their new charges, "and those facts would not be heard."  ECF 116, 44:14-15.  In fact, she testified that sometimes a probationer would be expressly told not to try to explain themselves.  ECF 116, 45:5-11.  But Dr. Redcross also testified that the probationer's public defender would sometimes speak to the facts of the new charges at the *Gagnon I* hearing and that the hearing officer would respond.  ECF 116, 57:10-16.

Emma Fenstermaker, another court watcher, testified that at the *Gagnon I* hearing, "the hearing officer would read the charges, either they would read the charges or pass it off to the probation officer to read the charges, and then the public defender would make arguments or they are supposed to make arguments in favor of the defendant, and then the defendant would be given a chance to speak."  ECF 116, 60:4-9.  The proceeding that Ms. Fenstermaker described is exactly the type of proceeding contemplated in *Morrissey* and *Gagnon*.

As evident from the court watchers' testimony, the probationer and counsel are present at the hearing, are able to put on evidence, and then the hearing officer makes a probable-cause determination.[11]  Moreover, as reflected in the record, the hearing officers fill out a form that memorializes whether they have determined that probable

---

[11] Overall, the Court views the court watchers' testimony as not entirely helpful on the issue of whether probationers were allowed to present a case related to whether probable cause exists, which is the purpose of the *Gagnon I* hearing.  Rather, it was clear that the court watchers were observing the proceedings with an eye toward the separate issue of whether probationers were given an opportunity to present a case for suitability for release.  Moreover, the short duration of the hearings as noted by the court watchers is also not really a sign of anything.  Probationers are represented by counsel.  There may be strategic reasons why the *Gagnon I* hearings are short— *e.g.*, defense counsel may not want to dispute probable cause or put on evidence to avoid prejudicing the defendant at the *Gagnon II* hearing or a hearing on any underlying criminal charges.  Again, no public defenders or criminal defense lawyers testified at the injunction hearing.

cause exists that the probationer violated his or her probation—this is evidence that the officers are doing what they are supposed to be doing.  Plaintiffs' Ex. 15 at p. 6.

Third, Plaintiffs argue that the length of time between the *Gagnon I* and *Gagnon II* hearings is impermissibly long.  It certainly is possible that there could be a due-process violation if a probationer is detained and there is a long delay between the *Gagnon I* and *Gagnon II* hearings.  "The denial of due process caused by a delay in a conducting a [*Gagnon II*] hearing requires a plaintiff to establish that the delay was both unreasonable and prejudicial."  *Ray v. Thompson*, No. 17-0608, 2021 WL 1565149, at *2 (E.D. Pa. Feb. 16, 2021) (collecting cases discussing various lengths of detention before a *Gagnon II* hearing as reasonable).  The Court cannot tell on this record whether the delay for Plaintiffs' hearings (let alone hearings for a putative class) was reasonable or prejudicial, or even whether the delay was caused by Defendants' policies or lack thereof.

Indeed, it appears that sometimes the delay may be by design of the parties.  For example, Mr. Oden-Pritchett testified that his attorney advised him not to file a motion to lift his probation detainer because his attorney was hoping to be able to negotiate a plea deal for Mr. Oden-Pritchett's new charges.  ECF 116, 115:12-23.  After Mr. Oden-Pritchett's new charges were resolved (through a plea), Mr. Oden-Pritchett was able to stipulate to a probation violation and receive credit for time served between his *Gagnon I* and *Gagnon II* hearings.  *Id.* at 117:3-16.  This is just one example of strategic decisions by counsel causing the delay, not Defendants' policies.[12]

Thus, to the extent that Plaintiffs are attacking the current hearing procedures as failing to comply with the requirements of *Gagnon*, the Court finds that there is

---

[12] On the form that the hearing officers complete at the *Gagnon I* hearing, they can schedule a *Gagnon II* hearing right away.  Plaintiffs' Ex. 19.  No evidence was adduced as to why probationers' counsel are unable to ask for the *Gagnon II* to be scheduled immediately and memorialized on that form.

insufficient evidence to support that claim and to warrant any injunctive relief.

**III.    The Court does not reach the remaining injunction factors.**

Because the Court has concluded that Plaintiffs are unlikely to prevail on their claims, the Court need not address the remaining injunction factors.   Lack of likelihood of success on the merits is fatal to the motion.  *Thomas v. Blocker*, 799 F. App'x 131, 135 (3d Cir. 2020) (affirming denial of motion for preliminary injunction after determining that plaintiff failed to show a likelihood of success on the merits); *In re Arthur Treacher's Franchisee Litig.*, 689 F.2d 1137, 1143 (3d Cir. 1982) ("a failure to show a likelihood of success or a failure to demonstrate irreparable injury, must necessarily result in the denial of a preliminary injunction.").

<u>**CONCLUSION**</u>

For the reasons above, the Court will deny Plaintiffs' motion for preliminary injunction.  An appropriate order follows.


DATED this 22nd day of December, 2023.

BY THE COURT:


/s/ *J. Nicholas Ranjan*
United States District Judge